**Docket No. 16-55917**

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————

ABS ENTERTAINMENT, INC., an Arkansas Corporation,
BARNABY RECORDS INC, a New York Corporation,
BRUNSWICK RECORD CORPORATION, a New York Corporation and
MALACO INC, a Mississippi Corporation, Each Individually and
On Behalf of All Others Similarly Situated,

*Plaintiffs-Appellants,*

v.

CBS CORPORATION, a Delaware Corporation and
CBS RADIO, INC., a Delaware Corporation,

*Defendants-Appellees.*

———————

*Appeal from a Decision of the United States District Court for the Central District of California,
No. 2:15-cv-06257-PA-AGR · Honorable Percy Anderson*

# BRIEF OF APPELLANTS

LAWRENCE M. HADLEY, ESQ.
*Principal Counsel*
RODERICK G. DORMAN, ESQ.
ROBERT E. ALLEN, ESQ.
ALAN P. BLOCK, ESQ.
MCKOOL SMITH HENNIGAN, P.C.
300 South Grand Avenue Suite 2900
Los Angeles, California 90071
(213) 694-1200 Telephone
(213) 694-1234 Facsimile

MARVIN A. MILLER, ESQ.
ANDREW SZOT, ESQ.
KATHLEEN E. BOYCHUCK, ESQ.
MILLER LAW LLC
115 South LaSalle Street, Suite 2910
Chicago, Illinois 60603
(312) 332-3400 Telephone
(312) 676-2676 Facsimile

*Attorneys for Appellants ABS Entertainment, Inc., Barnaby Records Inc.,
Brunswick Record Corporation and Malaco Inc.*

 

## CORPORATE DISCLOURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Counsel for Appellants certifies the following:

1.      The full name of every party or amicus represented by me is:

   ABS Entertainment, Inc., Barnaby Records Inc, Brunswick Record Corporation, Malaco Inc, each individually and on behalf of all others similarly situated.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   N/A

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

   **McKool Smith Hennigan, P.C.:** Lawrence M. Hadley, Roderick G. Dorman, Robert E. Allen, Alan P. Block

   **Miller Law LLC:** Marvin A. Miller, Andrew Szot, Kathleen Boychuck

i

# TABLE OF CONTENTS

I.   STATEMENT OF JURISDICTION ...............................................................1

II.  STATEMENT OF THE ISSUES ..................................................................1

III. STATEMENT OF THE CASE ......................................................................3

    A.   CBS's Unauthorized Copying and Broadcasting of Appellants'
        Pre-72 Sound Recordings...............................................................3

        1.   Appellants own pre-72 sound recordings. ..................................3

        2.   Appellants licensed pre-72 sound recordings for
            conversion from analog tape to CD solely for inclusion in
            reissue and compilation albums. ...............................................5

        3.   CBS copied, without authorization, Appellants' pre-72
            sound recordings from CD albums onto servers for use in
            its Internet radio service and over-the-air broadcasts. ...............6

    B.   The ABS Appellants' State Law Claims Against CBS........................8

    C.   The Proceedings Below..................................................................9

        1.   The district court denied class certification. ..............................9

        2.   The district court granted summary judgment to CBS. ............10

IV.  SUMMARY OF THE ARGUMENT ...........................................................14

V.   STANDARD OF REVIEW .......................................................................18

VI.  ARGUMENT............................................................................................19

    A.   The District Court Erred In Holding That CBS Had A Federally-
        Protected Right To Exploit Appellants' Pre-72 Sound
        Recordings Embedded In Remastered CDs. ......................................19

        1.   The Copyright Act preserves state law rights in pre-72
            sound recordings. ....................................................................19

ii

2.    Federal copyright protection in "derivative" works extends only to new, original expression, not to any preexisting material employed in the work................................20

3.    The right to exploit preexisting material contained within a derivative work is independent and separately enforceable from the new, original material.............................21

4.    State law rights apply to pre-72 recordings contained within post-72 derivative works. ...............................24

5.    The Copyright Act provides no right for CBS to exploit Appellants' pre-72 recordings contained in post-72 derivative works.......................................................28

B.    The District Court Erred In Finding That The Remastered Recordings CBS Copied Onto Its Servers Were Derivative Works. ....................................................................32

    1.    Appellants did not authorize the creation of derivative works. ......................................................32

    2.    The remastered copies contained no original new material "substantially different" from the original recordings.............37

C.    The District Court Erred In Granting Partial Summary Judgment On The Ground That CBS Did Not Play The Recordings In California...........................................................47

    1.    The Triton reports were admissible under the business records exception to the hearsay rule.......................47

    2.    The Triton reports show that CBS played Appellants' pre-72 recordings in California during the relevant time period.....................................................49

D.    The District Court Abused Its Discretion By Denying Class Certification.........................................................50

VII.   CONCLUSION AND RELIEF REQUESTED ..............................................54

CERTIFICATE OF COMPLIANCE .........................................................................55

STATEMENT OF RELATED CASES .......................................................................56

CERTIFICATE OF SERVICE ...................................................................................57

# TABLE OF AUTHORITIES

**CASES**                                                                **Page(s)**

*Atchison, Topeka & Santa Fe Ry. v. Hercules, Inc.*,
146 F.3d 1071 (9th Cir. 1998) .........................................................52, 53

*Balser v. Hain Celestial Grp., Inc.*,
640 Fed. Appx. 694 (9th Cir. Cal. 2016) (unpublished)....................53

*Bobbitt v. Milberg LLP*,
801 F.3d 1066 (9th Cir. 2015) ...........................................................18

*Burkhalter v. Montgomery Ward & Co.*,
676 F.2d 291 (8th Cir. 1982) ..............................................................51

*Capitol Records, Inc. v. Naxos of Am., Inc. (Naxos I)*,
262 F. Supp. 2d 204 (S.D.N.Y. 2003) ....................................27, 39, 40

*Capitol Records, Inc. v. Naxos of Am., Inc.* (*Naxos II*),
372 F.3d 471 (2d Cir. 2004) ........................................................passim

*Capitol Records, Inc. v. Naxos of Am., Inc. (Naxos III)*,
4 N.Y.3d 540 (2005)........................................................37, 38, 39

*Capitol Records, LLC v. BlueBeat, Inc.*,
765 F. Supp. 2d 1198 (C.D. Cal. 2010) ............................................27

*Case & Co. v. Board of Trade*,
523 F.2d 355 (7th Cir. 1975) ..............................................................36

*DC Comics v. Towle*,
802 F.3d 1012 (9th Cir. 2015) ...........................................................23

*Durham Indus. v. Tomy Corp.*,
630 F.2d 905 (2d. Cir. 1980) ...............................................37, 41, 44

*Entm't Research Grp. v. Genesis Creative Grp.*,
122 F.3d 1211 (9th Cir. 1997) ...................................................38, 45

*Fahmy v. Jay-Z*,
2015 U.S. Dist. LEXIS 68536 (C.D. Cal. May 27, 2015)...................33

*Fantasy, Inc. v. La Face Records*,
  1997 U.S. Dist. LEXIS 9068 (N.D. Cal. June 24, 1997)....................................27

*FDIC v. Staudinger*,
  797 F.2d 908 (10th Cir. 1986) .............................................................48

*Fonseca v. Sysco Food Servs. of Ariz., Inc.*,
  374 F.3d 840 (9th Cir. 2004) ..............................................................18

*Gilliam v. American Broadcasting Companies, Inc.*,
  538 F.2d 14 (2d Cir. 1976) .................................................................22

*Gracen v. Bradford Exchange*,
  698 F.2d 300 (7th Cir. 1983) ..............................................................37

*Harris v. Emus Records Corp.*,
  734 F.2d 1329 (9th Cir. 1984) ............................................................34

*Joseph N. Main P.C. v. Electronic Data Sys. Corp.*,
  168 F.R.D. 573 (N.D. Tex. 1996)..........................................................51

*Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*,
  266 F.2d 541 (2d Cir. 1959) ...............................................................45

*L.A. Printex Indus., Inc. v. Aeropostale*,
  2010 U.S. Dist. LEXIS 46951 (C.D. Cal. May 5, 2010)....................................34

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580 (9th Cir. 2008) ..............................................................52

*Lone Ranger Television, Inc. v. Program Radio Corp.*,
  740 F.2d 718 (9th Cir. 1984) ..............................................................23

*Maljack Prods., Inc. v. UAV Corp.*,
  964 F. Supp. 1416 (C.D. Cal. 1997) .................................................46, 47

*Munchoff v. Munchoff*,
  2015 U.S. Dist. LEXIS 118012 (C.D. Cal. Sep. 3, 2015) .................................52

*Oddo v. Ries*,
  743 F.2d 630 (9th Cir. 1984) ..............................................................23

*Perez v. Safelite Group Inc.*,
    2014 U.S. App. LEXIS 4353 (9th Cir. 2014) (unpublished).............................53

*PlayMedia Sys. V. Am. Online, Inc.*,
    171 F. Supp. 2d 1094 (C.D. Cal. 2001) ..............................................34

*Pryor v. Jean*,
    2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014) ....................28, 30, 31

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) ..........................................................9

*Russell v. Price*,
    612 F.2d 1123 (9th Cir. 1979) ..............................................21, 23, 29

*S.O.S., Inc. v. Payday, Inc.*,
    886 F.2d 1081 (9th Cir. 1989) ......................................................34

*Schrock v. Learning Curve Int'l, Inc.*,
    586 F.3d 513 (7th Cir. 2009) ........................................................36

*Stewart v. Abend*,
    495 U.S. 207 (1990)..........................................................21, 22, 29

*Tremain v. Bell Indus., Inc.*,
    196 F.3d 970 (9th Cir. 1999) ........................................................18

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
    692 F.3d 1009 (9th Cir. 2012) ............................................33, 38, 44

*U.S. v. Childs*,
    5 F.3d 1328 (9th Cir. 1993) ..........................................................49

*United States v. Ray*,
    920 F.2d 562 (9th Cir. 1990) ........................................................48

*United States v. Taxe*,
    380 F. Supp. 1010 (C.D. Cal. 1974) ..........................................passim

*Victor F. v. Pasadena Independent School Dist.*,
    793 F.2d 633 (5th Cir. Tex. 1986) ..............................................52, 53

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ...................................................................9

*Wolin v. Jaguar Land Rover North America LLC*,
  617 F.3d 1168 (9th Cir. 2011) ........................................................18

**STATUTES**

17 U.S.C. § 102(A)(6) .........................................................................1

17 U.S.C. § 103(a) ............................................................................32

17 U.S.C. § 103(b) ........................................................19, 20, 25, 30

17 U.S.C. § 103(c) ...........................................................................19

17 U.S.C. § 106(2) ...........................................................................33

17 U.S.C. § 114 .......................................................................passim

17 U.S.C. § 114(d) ......................................................................29, 30

17 U.S.C. § 114(f)(4)(B)(i) ...............................................................32

17 U.S.C. § 301(a) ...........................................................................20

17 U.S.C. § 301(c) ...................................................................2, 20, 29

28 U.S.C. §§ 1291 and 1294(1) ..........................................................1

28 U.S.C. § 1332(d)(2) ........................................................................1

California Business & Professions Code § 17200 (Cal. Unfair
  Competition Law) ...........................................................................8

California Civil Code § 980(2) ............................................................8

Copyright Act of 1976 ...............................................................passim

**OTHER AUTHORITIES**

37 CFR 370.2 ...................................................................................32

Fed. R. App. P. 4(a)(1)(A) ..................................................................1

Fed. R. Civ. P. 23 ...................................................................................9, 52

Fed. R. Civ. P. 56(a) ...................................................................................50

Fed. R. Evid. 602 ...................................................................................35

Fed. R. Evid. 803(6) ...................................................................................48

Fed. R. Evid. 806(3) ...................................................................................49

Fed. R. Evid. 1006 ...................................................................................36

C.D. Cal. L.R. 7-3 ...........................................................................10, 51, 52

C.D. Cal. L.R. 23-3 ..................................................................10, 50, 52, 53

## I.  STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(d)(2).  This appeal is taken from a final judgment of the United States District Court for the Central District of California (ER 1), along with previous orders and rulings including a November 25, 2015 Order striking Appellants' Motion for Class Certification, striking Plaintiff's class allegations, and denying Plaintiff's Motion to Appoint Interim Class Counsel (ER 2806).  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1294(1).  The district court entered final judgment in this action on May 30, 2016 (ER 1), and Appellants timely filed a Notice of Appeal on June 27, 2016 (ER 22) pursuant to Fed. R. App. P. 4(a)(1)(A).

## II.  STATEMENT OF THE ISSUES

The Copyright Act grants copyright protection in "original works of authorship," including "sound recordings," that are "fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. § 102(A)(6).  In granting copyright protection for "sound recordings" fixed in a tangible medium, Congress made an exception:  It reserved to "common law or statutes of any State" all rights or remedies with respect to sound recordings "fixed before February 15, 1972" ("pre-72

1

recordings") and extended those exclusive state rights until February 15, 2067.  *Id.*
§ 301(c).

Appellants own pre-72 recordings.  For some pre-72 recordings, Appellants
authorized their conversion from the original analog master tapes into a digital
compact disc ("CD") format for inclusion in reissue and compilation albums—a
process sometimes called "remastering."  As part of the remastering process,
certain sounds existing on the analog tapes were adjusted using only computer-
based equipment—new technology available with digital formats—to optimize the
recordings on the CD albums.  Sometime later, CBS copied, without permission,
the digitally remastered recordings onto its servers so it could publicly broadcast
the recordings through both its new Internet radio service and terrestrial broadcast
stations.

This Appeal raises the following issues:

1.    Whether the district court erred in holding that state law does not
govern Appellants' rights in copies of their pre-72 recordings that were digitally
remastered (from analog tapes) and computer-processed only to optimize pre-
existing sounds in the new digital format?

2.    Whether the district court erred in holding that the mere digital
remastering of Appellants' pre-1972 recordings, along with computer processing

only to optimize pre-existing sounds in the digital format, created derivative works under federal copyright law?

3.　Whether the district court erred in finding that Appellants failed to provide admissible evidence showing that CBS performed Appellants' sound recordings even though Appellants offered the same third party business reports that CBS uses to track what it plays in California?

4.　Whether the district court abused its discretion in denying class certification after striking Appellants' timely filed Motion for Class Certification based not on the merits, but on two trivial oversights in the "notice" of the motion?

## III.　STATEMENT OF THE CASE

### A.　CBS's Unauthorized Copying and Broadcasting of Appellants' Pre-72 Sound Recordings

#### 1.　Appellants own pre-72 sound recordings.

Appellants ABS Entertainment, Inc., Barnaby Records, Inc., Brunswick Record Corporation and Malaco, Inc. own sound recordings of musical performances that initially were fixed—recorded on a tangible media—prior to February 15, 1972.  (ER 1026, 1142, 1151, 1160, 1169).  In their First Amended Complaint, Appellants collectively identified 174 exemplary pre-72 sound recordings owned by them.  (ER 1030, 2922-32).  Appellants own all right, title and interest in the recordings, including all remastered copies of the recordings in any format.  (ER 2909).  These sound recordings capture the original studio

performances by, among other artists, Al Green, Andy Williams, the Chi-Lites, Jackie Wilson, Ray Stevens, the Everly Brothers, the Chordettes, and King Floyd. (*Id*.)

Appellants' pre-72 recordings were originally recorded in the analog format (before digital recording) and are the final mixed sound recordings of an artist's performance—commonly called the "master recordings." (ER 1026, 1142, 1151, 1160, 1169). Once recorded, Appellants (or their predecessors) applied a "mastering process" to each of the pre-72 recordings to create a copy optimized for the vinyl record format—called the "duplication master." (*Id*.) The duplication master and the master recording are identical in that both embody the identical performance and final mix of the musical artist, as originally fixed. (*Id*.)

Appellants had similar copies made from the master recording to serve as the duplication master for other formats, including analog cassette tapes and 8-track tapes (applying the "mastering process" again, often termed "remastering") to optimize the pre-72 sound recording for the applicable format. (ER 1027, 1142-43, 1151, 1160, 1169-70). With the advent of digital recordings, Appellants created a digital transfer copy for each of the pre-72 recordings. (*Id*.) Advancements in recording technology allowed for computer processing adjustments, which were used to optimize the recordings for the new formats. But none of the digital transfer copies or earlier duplication masters ever included remixing, editing,

4

resequencing, adding any new sound, or removing any sounds from the original pre-72 work.  (ER 287-88, 293, 1027).  Thus, all "remastered" sound recordings remained identical to the artists' performances fixed in the original master recording—save any adjustment of sound quality made available in the newly developed digital formats.  (ER 293, 1027).

### 2. Appellants licensed pre-72 sound recordings for conversion from analog tape to CD solely for inclusion in reissue and compilation albums.

For some pre-72 sound recordings, Appellants granted licenses allowing for the distribution of the recordings, including distribution as part of "compilation albums" with other sound recordings.  (ER 1027, 1143, 1152, 1161, 1170).  Such licenses, however, only allowed the licensee (for a limited term) to reproduce and distribute Appellants' recordings and not to create a derivative work or to make any substantial, non-trivial changes to the sound of these recordings.  (ER 1027, 1143-44, 1152-53, 1161-62, 1170-71).  For example, Appellants licensed certain pre-72 sound recordings to Rhino Entertainment Company ("Rhino").  Under the licenses, Rhino received the right to reproduce and distribute phonograph records embodying copies of the sound recordings.  (ER 1134-35).  In some instances, the licenses authorized Rhino to remaster the pre-72 recordings for CD release.  (Id.).  But Rhino never received authorization to create any derivative work from Appellants' pre-72 sound recordings—and it does not contend otherwise.  (ER

5

1044-45).  Nor has Rhino ever claimed ownership or a copyright interest in any of the remastered sound recordings.  (*Id.*)

To the contrary, Appellants retained all right, title and interest in the ownership of their respective pre-72 sound recordings.  (ER 1028-29, 1143-44, 1152-53, 1161-62, 1170-71).  These ownership rights extend to all remastered copies of their pre-72 recordings distributed under any license, regardless of the format or storage medium.  (ER 1029-29, 1143-44, 1152-53, 1161-62, 1170-71).

### 3. CBS copied, without authorization, Appellants' pre-72 sound recordings from CD albums onto servers for use in its Internet radio service and over-the-air broadcasts.

CBS provides a "Broadcast Service" to members of the public in California and elsewhere, and broadcasts sound recordings through numerous radio stations throughout California.  (ER 1017).  Among the sound recordings that CBS publicly performs, reproduces and distributes through the Broadcast Service are Appellants' recordings.  (ER 613-18, 686-87).

To manage and store sound recordings for its terrestrial radio stations, CBS uses the AudioVAULT and AudioVAULT FLeX third-party software systems. (ER 1017).  CBS stores these sound recordings in digital format (e.g., .mp3, .wav). (ER 1017).  Each of CBS's terrestrial radio stations located in Los Angeles has its own AudioVault or AudioVault FleX system for sound recording storage.  (ER 683, 1017).

6

CBS also digitally streams Appellants' sound recordings over the Internet from the CBS-owned website, Radio.com. (ER 633). To manage and store sound recordings for its Internet music services, CBS utilizes a proprietary program called Radio 2.0. (ER 629, 1015). Radio 2.0 is web-based and stores CBS's sound recordings in digital format. (e.g., .mp3, .wav). (*Id*.) To populate the Radio 2.0 databases to broadcast and stream Appellants' musical recordings to the public, CBS reproduced and copied Appellants' pre-72 recordings to CBS's servers and storage devices without Appellants' authorization. (ER 628). As Seth Neiman— CBS's corporate representative and Director of Digital Audio—testified:

> Q.     And how does the information on each song that's played get into, or come to be stored someplace that is in a way that can be accessed by a computer?
>
> A.     Music is ripped from CDs or entered from digital files that are sent to us from labels.

(*Id*.)

Without Appellants' authorization, CBS then streams these copies of Appellants' sound recordings on Radio.com through servers maintained in New York City. (ER 631-32, 1014-15). The streams originate from two sources: (1) CBS's "exclusive," Internet-only stations—which CBS creates and programs for Internet streaming, (ER 634, 1030), and (2) "simulcasts" of CBS terrestrial radio AM, FM and HD radio broadcast stations located in the United States (ER 634-36, 641, 1030). Thus, through the Radio.com website, a user can listen to simulcasts

7

of all 80 CBS-owned music radio stations from anywhere in the United States. (*Id*.)

CBS's Radio 2.0 system records and logs the identity "of all sound recordings it digitally transmits over the Internet." (ER 629-30, 1016-17). Indeed, "Radio 2.0 provides tracking and reporting information for each digital stream by Internet only stations." (ER 1017). Additionally, CBS pays an outside vendor—Triton—to track its Internet simulcasts of terrestrial radio stations on Radio.com. (ER 637-38, 1017). Because virtually all of CBS's terrestrial radio stations simulcast each broadcast over the Internet, the Triton reports effectively reflect all of Appellants' pre-72 recordings that CBS broadcasts terrestrially without Appellants' authorization. (ER 634-36, 641, 1030).

### B.     The ABS Appellants' State Law Claims Against CBS

As a result of CBS's unauthorized copying, broadcasting, and streaming of Appellants' pre-72 recordings, Appellants sued CBS on behalf of themselves and all other similarly situated owners of pre-72 recordings for: (1) Violation of California Civil Code § 980(2); (2) Misappropriation; (3) Violation of California Business & Professions Code § 17200 (Cal. Unfair Competition Law); and (4) Conversion. (ER 2902-32).

## C.    The Proceedings Below

### 1.    The district court denied class certification.

As a class action complaint, Central District of California Local Rule ("LR") 23-3 required that Appellants file a motion for class certification within 90 days after the service of the complaint, unless otherwise ordered by the Court—in this case, by November 19, 2015.  Because this date was prior to the Rule 26(f) scheduling conference, set for December 14, 2015, the parties stipulated, on November 16, 2015, to extend the deadline for filing the class certification motion to a date following the Scheduling Conference. (ER 2898-2901).

One day later, the court denied the parties' stipulation, indicating that there was "[n]o show of cause, let alone good cause."  (ER 2897).  In response, the parties, on November 18, 2017, filed an amended stipulation, this time identifying as good cause the need for class certification discovery and the parties' desire to allow CBS to initially file an anti-SLAPP motion.[1]  (ER 2888-92).  The parties stipulated that the date for filing the class certification motion would be 90 days following the ruling on CBS's anti-SLAPP motion.  (ER 2890-91).

---

[1] The stipulation expressly stated that certain discovery was necessary for the class certification motion under Fed. R. Civ. P. 23 and its requirement that a district court conduct a "rigorous analysis" of the "factual demonstration by the party seeking class certification that the prerequisites for certification are satisfied."  *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011); *Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 985 (9th Cir. 2015).

On November 19, 2015, the LR 23-3 due date for filing the class certification motion, the court denied, without any explanation, the parties' stipulated request to extend the filing date. (ER 2894-95). Later that same day, Appellants timely filed their motion for class certification. (ER 2808-85).

On November 25, 2015, the court issued an order striking Appellants' motion for class certification on two grounds: (1) the date set by Appellants for the hearing, February 22, 2016, was beyond the date permitted by the Judge's Standing Order of no more than 35 days after service of the motion; and (2) the motion failed to include the statement required by LR 7-3 regarding a conference of counsel. (ER 2806). After striking Appellants' motion, the court then ruled that Appellants had not complied with LR 23-3, because they had not timely filed a motion for class certification. Without a timely motion, the court struck Appellants' class allegations—barring this case from proceeding as a class action. (ER 2806-07).

## 2. The district court granted summary judgment to CBS.

In a May 30, 2016 order, the district court granted summary judgment to CBS. (ER 3-21). The court held that "Plaintiffs have failed to create a genuine dispute of material fact as to whether the versions of Plaintiffs' works performed by CBS [the remastered digital CD copies] included sufficient originality to qualify for a federal copyright." (ER 14). In reaching this holding, the district court

sustained CBS's evidentiary objections to the Declaration of Paul Geluso, Appellants' music technology expert, (ER 284-567) and excluded it in its entirety. (ER 12). On the other hand, the court agreed with CBS's music expert, Dr. Durnad Begault, that Appellants' pre-72 recordings had undergone sufficient, original changes during the remastering process to qualify for federal copyright protection. (ER 14).

In finding that the remastering process effectively turned Appellants' pre-72 recordings into federally-governed, post-72 derivative works, the court never considered whether any substantial difference existed between the remastered copies on CBS's servers and Appellants' underlying pre-72 recordings. Instead, the court concluded that the changes during remastering reflected "'multiple kinds of creative authorship, such as adjustments of equalization, sound editing, and channel assignment.'" (ER 14 (citing Begault Declaration at ¶¶ 77, 80, 85, 91)). But Dr. Begault never said that any of the recordings he examined had undergone a change in "channel assignment." (ER 1455-56, 1458-59, 1462-63, 1467-68). Indeed, Dr. Begault only determined whether the sounds in a recording on CBS's server were "the same" as a corresponding recording provided by Appellants in this case. (ER 10). According to Dr. Begault, any differences between the recordings for "timbre, spatial imagery, sound balance, or loudness"—even a one decibel change in loudness—resulted in a "different version" of the sound

11

recording. (*Id*). Although these sound characteristics had never been used to establish the existence of a derivative work under copyright law, the district court found that Dr. Begault's conclusions were sufficient to establish a derivative work.

The court further rejected Appellants' contention that, through its license agreements to remaster, Appellants never authorized any alterations that would constitute original and independent expressions. (ER 16-17). As support, Appellants submitted declarations from the representatives of each named plaintiff, Don Wilson (ABS) (ER 1150-54), Lawrence Kartiganer (Barnaby) (ER 1168-72) , Paul Tarnopol (Brunswick) (ER 1141-45), and Thomas Couch (Malaco) (ER 1159-63), each of whom testified that they never granted such a license when remastering their pre-72 recordings. But the court sustained CBS's evidentiary objections to these declarations and excluded each of them. (ER 16). The court held that it was Appellants' burden to produce the licenses under which the remastered copies of the pre-72 recordings were created to demonstrate that they affirmatively barred the creation of a copyrightable work, and had they done so, they would have defeated CBS's summary judgment motion. (ER 17).

Additionally, while the court agreed that Appellants' pre-72 recordings were embedded in the corresponding digitally remastered copies on CBS's servers (and that Appellants retained their common law rights in those embedded recordings), it nevertheless held that CBS did not infringe Appellants' common law rights. (ER

12

17).  Without explanation, the lower court determined that CBS had the right to perform the remastered digital copies of Appellants' pre-72 recordings on terrestrial radio and on digital platforms under a federal compulsory license provided in 17 U.S.C. § 114.  (ER 17).

Lastly, the court held that Appellants failed to provide evidence that CBS performed 126 of the 174 sound recordings identified in their complaint.  (ER 18).  Although Appellants submitted the "Triton reports" with its opposition to CBS's summary judgment motion—the same reports CBS uses in its business to track what recordings it broadcasts—the court sustained CBS's hearsay objection to the Triton reports and excluded them from evidence.  (ER 18-19).  But the reports easily fit within the business records exception:  They plainly list the pre-72 recordings that CBS played on its terrestrial radio stations and simulcast over the Internet.  (ER 582-84; 620-22; 637-41; 707-08; 714-889; 1035-36).  Moreover, CBS's Director of Digital Audio, Seth Neiman, testified that CBS contracts with Triton for the reports, CBS receives and stores the reports, and CBS used the reports to determine the royalties it owes for Internet broadcasts of post-72 recordings.  (ER 1034; 637-40).

Aside from the evidentiary ruling, the district court found that the Triton reports only demonstrate that "CBS publicly performed a sound recording which has the same title and artist as one of the works owned by Plaintiffs."  (ER 19).

13

According to the court, the Triton reports were insufficient to create a genuine dispute of material fact that CBS performed Appellants pre-72 recordings because CBS could have played a different performance—even though CBS offered no evidence that it did so in moving for summary judgment, (ER 19), and even though these reports specifically identify the particular album from which the performance was derived (ER 714-889).

## IV. SUMMARY OF THE ARGUMENT

In granting summary judgment against Appellants, the district court held that that state law does not govern Appellants' rights in copies of their pre-72 recordings that were digitally remastered from analog tape into a digital CD format, and computer processed to optimize pre-existing sounds in the new digital format. According to the court, the digital remastering and computer processing created derivative works under federal copyright law. As derivative works, the court held that CBS had the right to perform the pre-72 recordings under § 114 of the Copyright Act. This decision conflicts with settled law:

1. Even if digitally remastered copies of Appellants' pre-72 recordings were "derivative works" under federal copyright law, Appellants still retained their state law rights in the underlying pre-72 recordings embodied in the derivative works. Although the district court agreed with this settled law, it erred in finding that the compulsory license in § 114 of the Copyright Act gave CBS the right to perform

14

the underlying pre-72 recordings.  Section 114 affords no such right.  To the

contrary, the right to exploit underlying works contained within derivative works

remains independent and separately enforceable from any new, original material

used to produce a derivative work.  Nothing in § 114 extends federal copyright

protection to pre-72 recordings contained within derivative works.  Indeed, all

cases addressing this issue have reached the opposite conclusion:  State law

continues to govern pre-72 recordings even when those works underlie derivative

works created after 1972.  Thus, only state law governs Appellants' pre-72

recordings even when contained in any derivative work.

2.  The district court further erred because the digitally remastered copies of

Appellants' pre-72 works are not "derivative" works in the first place.  Computer

processing to optimize the existing sounds to be heard when migrating from one

medium (analog) to another (digital) are outside the category of original, creative

changes to a sound recording that would qualify as a derivative work.  While new

material in a derivative work must be only minimally original and creative, the

new material must be "substantially different" than the original.  Otherwise, the

term of copyright in an underlying work could be extended indefinitely by

continuing to include it with trivial and indiscernible new material.  In this case,

the computer processing of the pre-existing sounds in Appellants' pre-72

recordings were barely perceptible, if at all—and then only to a computer operated

by CBS's sound expert. All cases to consider this issue agree that mere digital remastering and computer processing only to optimize pre-existing sounds in a new digital format do not produce differences sufficient from the original to create derivative works under federal copyright law.

3. The district court further erred in finding that the necessary authorization had occurred to create a federally-protected derivative work. Only the owner of a work can authorize the creation of a derivative work. As the party accused of violating Appellants' rights in the sound recordings, CBS had the burden of proving that the songs it performed were federally-governed derivative works. CBS offered nothing to sustain its burden. Yet the district court incorrectly shifted the burden to Appellants to demonstrate an absence of authorization. Despite incorrectly shifting that burden, Appellants still submitted five declarations, all un-contradicted, from its executives and licensees stating that no derivative works had been authorized. But the district court struck every declaration—incorrectly finding that the witnesses lacked personal knowledge of their own licenses.

4. The district court also erred in granting summary judgment as to 126 of Appellants' recording on the ground that Appellants failed to provide sufficient evidence that CBS played them in California. After considerable effort, CBS finally admitted that it contracts with a third party to track every recording it plays and eventually produced the "Triton reports" showing what it played. Despite

16

CBS's own use of these records to compensate owners of post-72 recordings, the district court struck the records as "hearsay" and refused to admit them under the business records exception. This was plain error and an abuse of discretion that should be reversed.

5. Prior to the summary judgment proceedings, the district court abused its discretion in striking the class certification allegations in the complaint. Appellants timely filed a motion for class certification in accordance with the Central District of California local rules. Yet the court struck the motion, not because it failed to properly state grounds for class certification, but because the "notice" of the motion contained two trivial errors. First, the notice did not state that the parties had conferred in advance of the motion, even though the motion itself is mandated under the rules and the parties, by prior stipulation proposing to extend the time for Appellants to file their motion for class certification, had made clear to the lower court that CBS was opposing Appellant's motion for class certification. Second, the motion sought a hearing date for class certification outside of the Judge's normal schedule for such hearings. Once struck, the court *sua sponte* denied class certification because the deadline to file had passed. Denying class certification is a serious penalty—particularly for plaintiffs who may not have individual claims large enough to warrant federal litigation.

17

Eliminating the right to proceed as a class on trivial errors in the notice of a timely filed motion should be reversed as an abuse of discretion.

## V.    STANDARD OF REVIEW

This Court "review[s] de novo a district court's summary judgment ruling." *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 975 (9th Cir. 1999).  This Court "review[s] for an abuse of discretion evidentiary rulings made in the context of summary judgment."  *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 845 (9th Cir. 2004).

This Court reviews a district court's order granting or denying class certification for an abuse of discretion but gives *less* deference to a district court's *denial* of class certification than to a district court's order granting class certification.  *Wolin v. Jaguar Land Rover North America LLC*, 617 F.3d 1168, 1171 (9th Cir. 2011).

"A district court abuses its discretion when it makes an error of law, or when it reaches a result that is illogical, implausible, or without support in inferences that may be drawn from the record."  *Bobbitt v. Milberg LLP*, 801 F.3d 1066, 1069 (9th Cir. 2015).

# VI.   ARGUMENT

**A.    The District Court Erred In Holding That CBS Had A Federally-Protected Right To Exploit Appellants' Pre-72 Sound Recordings Embedded In Remastered CDs.**

The district court found that the remastering of Appellants' pre-72 recordings from analog tape into a CD digital format, together with computer-based adjustments to equalization, sound balance, and loudness, created derivative works.  (ER 4, 10, 14).  At the same time, the district court agreed that Appellants retained their state law rights (preserved under 17 U.S.C. § 103(c)) in the pre-72 recordings "embedded" in the "derivative works" because the right to exploit a derivative work "extends only to the original and independent expression contained [in the derivative work]."  (ER 17 (citing 17 U.S.C. § 103(b)).  Nonetheless, the district erred by labeling each remastered work a "post-1972 sound recording" and holding that CBS had a federal statutory right to exploit the entire work, including the underlying pre-72 recordings upon which each remastered copy is based.  (*Id.*)

## 1.    The Copyright Act preserves state law rights in pre-72 sound recordings.

The Copyright Act of 1976 contains a general preemption clause, providing that rights "equivalent to any of the exclusive rights within the general scope of copyright" are governed exclusively by the federal statute.  17 U.S.C. § 301(a).  But the Act carves out an exception for pre-72 recordings, placing them outside the

19

reach of the Copyright Act and expressly limiting all rights in such recordings to state law:

> With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067. [] Notwithstanding the provisions of section 303, no sound recording fixed before February 15, 1972, shall be subject to copyright under this title before, on, or after February 15, 2067.

17 U.S.C. § 301(c). Thus, post-72 recordings are only subject to federal law protection and pre-72 recordings are only subject to state law protection—at least until 2067.

### 2. Federal copyright protection in "derivative" works extends only to new, original expression, not to any preexisting material employed in the work.

The Copyright Act provides that the copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not provide any exclusive right in the preexisting material. The copyright in such work is *independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.*" 17 U.S.C. § 103(b) (emphasis added). Thus, in a derivative work, any federal right to exploit applies to the new material only, not to any preexisting material contained within the overall work.

20

The Ninth Circuit agrees that federal copyright protection in a derivative work does not extend beyond the original, new expression contained in that work. *Russell v. Price*, 612 F.2d 1123, 1128 (9th Cir. 1979) (reaffirming "well-established doctrine that a derivative copyright protects only the new material contained in the derivative work, not the matter derived from the underlying work"). No other rule makes sense. Indeed, if new federal copyright protection extended to the entirety of a derivative work, including preexisting material contained in the derivative work, any copyright in the preexisting material could be extended indefinitely by continuing to incorporate the preexisting material, along with new expression, in derivative works.

### 3. The right to exploit preexisting material contained within a derivative work is independent and separately enforceable from the new, original material.

The right to exploit a derivative work is independent of any rights in the underlying work on which the derivative work is based. The Supreme Court confirmed this rule in *Stewart v. Abend*, 495 U.S. 207 (1990). In *Abend*, defendants produced the Alfred Hitchcock film "Rear Window" based on motion picture rights they acquired to a Cornell Woolrich short story. *Id*. at 212. Plaintiff Abend, who had acquired copyright ownership of Woolrich's short story, brought suit alleging that the continued exploitation of the derivative work film infringed his copyright in the underlying short story on which the film had been based. *Id*. at

21

213.  The Supreme Court found that defendants' rights in the derivative work film that they had created provided no defense to a claim of copyright infringement in the underlying, preexisting work:

> The aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work.  So long as the pre-existing work remains out of the public domain, its use is infringing if one who employs the work does not have a valid license or assignment for use of the pre-existing work.  It is irrelevant whether the pre-existing work is inseparably intertwined with the derivative work.

*Id*. at 223 (citations omitted).

The Supreme Court further rejected as "clearly wrong" the argument that once a preexisting work has been included in a derivative work, the entire derivative work becomes completely independent of the preexisting work.  Instead, for both the preexisting work and the elements added to create the derivative work, the Court required examining the rights to each work separately "for the validity and scope of its grant of rights."  *Id*. at 235.

The independent nature of the preexisting work in a derivative work permits the preexisting work owner to sue an infringer of the derivative work who copies elements from the preexisting work.  *See Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14, 20 (2d Cir. 1976) ("Since the copyright in the underlying script survives intact despite the incorporation of that work into a

derivative work, one who uses the script, even with the permission of the proprietor of the derivative work, may infringe the underlying copyright").[2] The ability of an owner to enforce rights attached to preexisting works within derivative works applies even if the new elements in the derivative work loses copyright protection. *Russell*, 612 F.2d at 1128 (finding that a derivative work's entry into the public domain did not affect the rights in the still protected underlying work).

The separate enforcement of rights for derivative works also apply even when state law protects the underlying works and federal law protects the original new material. For example, the Ninth Circuit has held that separate and distinct claims may be asserted for different elements in the same derivative work, one based on the preexisting work and one based on the new elements, including claims for copyright infringement and violation of state law rights. *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 723, 726 (9th Cir. 1984)

---

[2] This same rule applies in the Ninth Circuit. *See DC Comics v. Towle*, 802 F.3d 1012, 1023-24 (9th Cir. 2015) ("[T]he author of an underlying work is entitled to sue a third party who makes an unauthorized copy of an authorized derivative work to the extent that the material copied derived from the underlying work"); *Oddo v. Ries*, 743 F.2d 630, 634 (9th Cir. 1984) (plaintiff's grant of an implied license to defendant to use plaintiff's preexisting articles in a derivative work manuscript did not grant defendant the right to use the preexisting articles in any other derivative work, such as defendant's book, for which defendant was liable for copyright infringement).

(permitting the plaintiff, in an action alleging infringement of its sound recordings for the Lone Ranger programs, to sue both for copyright infringement of the underlying scripts as well as for state law claims related to its derivative pre-72 recordings embodying those scripts).

### 4. State law rights apply to pre-72 recordings contained within post-72 derivative works.

Because derivative work copyrights only extend to original new material, pre-72 recordings cannot become post-72 recordings, subject to federal copyright law, simply by combining the pre-72 recordings with original new material as part of a derivative work.  Any federal copyright in a derivative work containing preexisting pre-72 recordings and post-72 original new material only extends to the latter.  As such, owners of underlying pre-72 recordings that are incorporated within post-72 derivative works are not divested of their state law rights, even if the derivative work was created with the consent of the owner of the preexisting material.  In this regard, the district court agreed.  (ER 17 ("Plaintiffs claim that they retain their common law rights in their pre-1972 Sound Recordings embedded in the derivative works performed by CBS….  The Court agrees with this assertion")).

Applying this principle, exploitation of derivative works containing preexisting pre-72 recordings and post-72 original new material requires two separate consents—one from the owner of the new copyrighted elements of the

24

derivative works and another from the owner of the preexisting works. The express language of the Copyright Act compels this result. Section 103(b) excludes any preexisting material from any federal copyright in a derivative work. And section 301 preserves state law protection over pre-72 sound recordings. Read together, state law rights must be preserved in underlying pre-72 sound recording contained in later, post-72 derivative works.

Case law confirms this result as well. In the first criminal prosecution under the 1971 Sound Recording Amendment to the Copyright Act, *United States v. Taxe*, 380 F. Supp. 1010 (C.D. Cal. 1974), defendants were charged with criminal copyright infringement for re-recording and distributing 8-track tapes that included both pre-72 and post-72 recordings. During the re-recording process, defendants made a number of changes to all of the recordings on the distributed tapes. *Id*. at 1012. Following the defendants' conviction, the court addressed two issues regarding the application of federal copyright law.

First, the court considered whether federal copyright infringement could apply to the pre-72 works on the tapes. Although the court treated the tapes as "derivative works," the court found that defendants could only be liable for federal copyright infringement for re-recording the post-72 works—the pre-72 works were not subject to federal copyright protection. *Id*. at 1013. The fact that the pre-72 works had been included in the re-recorded tapes could not convert them into post-

25

72 works because re-recording a pre-72 work could not satisfy the originality requirement for a copyright in the derivative tapes:

> Obviously, the re-recording of a previously fixed song cannot meet the originality requirements, and those portions of such a derivative work are unprotected…. [A] common sense reading of the sound recording amendment of 1971 yields the same result, since the restriction of protection to works fixed after February 15, 1972, would be meaningless if works fixed before that date could gain protection simply by being re-recorded in new albums.

*Id.*

Second, the court considered the effect of the changes made to the works during the re-recording process. During the re-recording, defendants had altered both the pre-72 and post-72 works by "speeding up, slowing down, deletion of certain frequencies or tones [or reduction of the volume], addition of echoes or moog synthesizers." *Id.* at 1012. Despite these changes, the court explained that the defendants still could not be liable under federal law for infringement of the pre-72 recordings because those recordings were initially fixed prior to February 15, 1972:

> There can be no infringement unless the work infringed had a date of fixation after February 15, 1972. "Date of fixation" means the date on which the work claimed to have been infringed was *first embodied in a final master recording from which copies are later made*."

*Id.* at 1016 (emphasis added). Thus, the court instructed the jury that "[a]n

infringement which recaptures the actual sounds by re-recording remains an

infringement even if the re-recorder makes changes in the speed or tone of the

original or adds other sounds or deletes certain frequencies, unless his final product

is no longer recognizable as the same performance." *Id.* at 1017, *aff'd*, 540 F.2d

961, 965 (9th Cir. 1976) ("'[I]ndependent fixation' [is] a separate performance,

expressly excluding re-recording, *even with changes*") (emphasis added).[3]

The Second Circuit followed the same rule in *Capitol Records, Inc. v. Naxos*

*of Am., Inc*. (*Naxos II*), 372 F.3d 471 (2d Cir. 2004).  In *Naxos*, the accused

infringer remastered copies of Capitol's pre-72 shellac phonorecords into a digital

format.  The remastering "involved artistic choices and the use of the latest digital

software," for which "Naxos needed to employ significant effort to create an

entirely new and commercially viable product," and "Naxos worked to create a

new product with superior sound."  *Capitol Records, Inc. v. Naxos of Am., Inc.*

*(Naxos I)*, 262 F. Supp. 2d 204, 208-09, 214, 215 (S.D.N.Y. 2003).  Although

Naxos' remastered recordings were created after 1972, the Second Circuit held that

---

[3] *See also Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1202, 1206 (C.D. Cal. 2010) (granting partial summary judgment to plaintiffs in their state law claims even though defendant copied CDs of plaintiff's pre-72 recordings); *Fantasy, Inc. v. La Face Records,* 1997 U.S. Dist. LEXIS 9068, at *4 n.1, *5 (N.D. Cal. June 24, 1997) (plaintiff included its pre-72 recording in a post-1972 federally protected compilation album; even if defendant copied the pre-72 recording from the post-72 compilation album, the recording was not federally protected: "federal copyright protection can never extend to sound recordings 'fixed before February 15, 1972.'").

Capitol's infringement claims were subject only to state law, not federal copyright: "[B]ecause the *original* recordings were fixed before February 15, 1972, they are neither protected nor preempted by federal copyright law, and Capitol's copyright claim therefore depends on state law protection until federal preemption occurs on February 15, 2067." *Naxos II*, 372 F.3d at 477 (emphasis added). Thus, the alterations during the remastering process made no difference—state law applied to Capitol's claims for the underlying recordings contained in the post-72 digitally remastered derivative copies.

> **5.** **The Copyright Act provides no right for CBS to exploit Appellants' pre-72 recordings contained in post-72 derivative works.**

Despite agreeing that Appellants' retained their state law rights in the pre-72 recordings embedded in the digitally remastered CD copies, the district court held that CBS still had a federal right to perform the "derivative works," including the underlying pre-72 recordings, by casting the remastered copies as "post-1972 sound recordings." (ER 17). In support, the district court cited only § 114 of the Copyright Act and one district court case—*Pryor v. Jean*, 2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014). But the remastered CD copies of pre-72 recordings are not post-72 recordings, and neither § 114 nor *Pryor* supports the district court's contrary conclusion.

First, the district court erred in labeling all the content on the CDs that CBS

28

copied onto its servers as "post-1972 sound recordings." (ER 17). It is undisputed that Appellants' sound recordings contained within the CDs were "fixed before February 15, 1972," and thus cannot "be subject to copyright under this title…." 17 U.S.C. § 301(c); *see also Naxos II*, 372 F.3d at 477 ("[B]ecause the original recordings were fixed before February 15, 1972, they are neither protected nor preempted by federal copyright law"); *Taxe*, 380 F. Supp. at 1016. The independent nature of the content making up derivative works—preexisting material and original new material—necessarily means that federal copyright only applies to the new material, not the preexisting material contained in the derivative work. *Abend*, 495 U.S. at 223, 225; *Russell*, 612 F.2d at 1128; Keziah, *Registration Problems Encountered By The Copyright Office Under the Recent Sound Recording Amendment*, 20 BULL. COPR. SOC'Y 3, Item 2 at 15 (1972) ("In other words, statutory copyright in a particular sound recording cannot be secured . . . in any sounds that were *fixed* before *February 15, 1972*….") (ER 34-50) (emphasis in original).

Second, the district court erred in finding that § 114 of the Copyright Act gave CBS the right to copy the CDs onto its servers and to perform them over the Internet and terrestrial radio. Section 114 provides only a limited exception to the exclusive rights in a digital audio, non-subscription broadcast transmission, subject to the broadcaster's compliance with the statutory requirements. 17 U.S.C. §

114(d).  Section 114 does not affect § 310's limitation of the Copyright Act to post-72 recordings.  Indeed, the limited statutory license in § 114 has no application to pre-72 recordings, which remain governed exclusively by state law under § 310.  Nor does § 114 affect § 103(b)'s restriction of a federal copyright in derivative works to only the new original expression as opposed to preexisting material.  And § 114 does nothing to set aside the established precedent recognizing separate enforcement rights—including separate state law and federal rights—for original new material and underlying preexisting material contained in derivative works.

Nor does *Pryor* support the district court's decision.  *Pryor* concerned a 1974 sound recording of David Pryor's "Bumpin' Bus Stop" originally contained on a "Gold Future Record" and later licensed for remastering as a derivative work to Private Stock Records.  Consistent with the license, Private Stock, after remastering, obtained a copyright registration that included the "Bumpin' Bus Stop" musical composition.  Private Stock later licensed its sound recording of "Bumpin' Bus Stop" to defendants for sampling in movies and television.  *Pryor*, 2014 U.S. Dist. LEXIS 143515 *Id.* at *3-5.  Pryor's heirs sued defendants for copyright infringement, but the district court dismissed because the heirs could not show that the samples came from Pryor's performance on the Gold Future Record (on which the heirs allegedly held a copyright) as opposed to the Private Stock

30

album— on which Private Stock held the copyright and had licensed defendants. *Id*. at *11-12. Indeed, it was undisputed that the "actual sounds" of David Pryor's voice fixed in the Gold Future recording differed from the sounds on the Private Stock recording. (ER 992, 1005-08). In other words, the court did not hold that defendants had the right to reproduce the heirs' underlying sound recording—it found that the sound recordings owned by the heirs were never used in the derivative work. Thus, *Pryor* provides no support for disregarding Appellants' independent state law rights in the underlying sound recordings embedded in the CDs that CBS reproduced and performed.

In sum, neither § 114 nor *Pryor* limit state law rights in pre-72 recordings, even when they are contained within post-72 derivative works. If a broadcaster seeks use of § 114's statutory license for a derivative work containing an underlying pre-72 sound recording, the law dictates that it must—besides complying with the statutory requirements of § 114—obtain a license from the owner of the pre-72 underlying work. Here, CBS offered no evidence that it obtained a license from Appellants for the underlying pre-72 recordings contained on the CDs it copied onto its servers. Thus, the district court erred in granting summary judgment.[4]

---

[4] Even if the statutory license in § 114 applied to any original new material on the CDs (which it does not), CBS offered no evidence that it complied with the

31

**B.** **The District Court Erred In Finding That The Remastered Recordings CBS Copied Onto Its Servers Were Derivative Works.**

The district court erred in granting summary judgment for another reason: The recordings that CBS copied onto its servers and publicly performed— consisting entirely of pre-72 recordings converted from analog tape to digital CDs with computer-generated adjustments to some sounds—are not derivative works under the Copyright Act. For one, Appellants' exclusive rights in their pre-72 recordings include the right to authorize the creation of derivative works. But CBS offered no evidence that Appellants ever authorized a derivate work. For another, the computer-generated adjustments to the pre-72 recordings do not, as a matter of law, rise to the level of original new material sufficient for protection as a derivative work. Accordingly, the digitally remastered copies of Appellants' pre-72 recordings contain no post-72 sounds subject to federal copyright.

**1.** **Appellants did not authorize the creation of derivative works.**

Any creation of a federally-protected derivative work from Appellants' pre-72 recordings required their authorization. *See* 17 U.S.C. § 103(a) ("[P]rotection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.");

---

statutory licensing requirements. *See* 17 U.S.C. § 114(f)(4)(B)(i); 37 CFR 370.2. Accordingly, summary judgment still would have been wrongly granted.

17 U.S.C. § 106(2) ("[T]he owner of copyright under this title has the exclusive rights to do and to authorize . . . [the preparation of] derivative works based upon the copyrighted work"). Without the owner's consent, the preparer of a derivative work cannot create a work protectable by copyright. *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012). CBS, however, offered no evidence that Appellants, in licensing their pre-72 recordings for conversion to the digital format and inclusion in CDs, authorized any original new material that could qualify for derivative work protection.

Although the court found no evidence that Appellants had authorized the creation of derivative works, it wrongly placed the burden on Appellants prove an absence of authorization:

> [I]t was Plaintiffs' burden to produce the licenses under which the derivative works were created, and demonstrate that they affirmatively barred the creation of a copyrightable work. Had Plaintiffs shown that the works which CBS performed were created either without authorization, or pursuant to a license which affirmatively barred the creation of a copyrightable derivative work, Plaintiffs would have defeated CBS's summary judgment motion.

(ER 17 (citation omitted)).

But the law in the Ninth Circuit is the opposite. CBS, as the alleged infringer, "has the burden of showing that [it] holds a license." *Fahmy v. Jay-Z*, 2015 U.S. Dist. LEXIS 68536, at * 13 (C.D. Cal. May 27, 2015) (citing *Bourne v.*

33

*Walt Disney Co*., 68 F.3d 621, 631 (2d Cir. 1995)); *see also Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333-34 (9th Cir. 1984) (holding that a copyright license is not transferable as a matter of law). CBS further had the burden to prove that it was an authorized sublicensee of any of the licenses entered into by Appellants (which it did not). *See PlayMedia Sys. V. Am. Online, Inc.*, 171 F. Supp. 2d 1094, 1099 (C.D. Cal. 2001). Finally, it was CBS's burden, not Appellants', to demonstrate that Appellants had granted the right to create a copyrighted derivative work: "[C]opyright licenses are assumed to prohibit any use not authorized." *S.O.S., Inc. v. Payday, Inc*., 886 F.2d 1081, 1088 (9th Cir. 1989).

The district court solely relied on the vacated ruling in *L.A. Printex Indus., Inc. v. Aeropostale*, 2010 U.S. Dist. LEXIS 46951 (C.D. Cal. May 5, 2010), in support of placing the burden of disproving authorization on Appellants. But the existence of a license was not at issue in that case. To the contrary, in that case the parties did not dispute the existence of a license, which "clearly grant[ed] to [plaintiff] the nonexclusive right to copy and modify [the pre-existing works]." *Id.* at *8-9. Thus, *Printex* does not support placing the burden of disproving authorization on the owner of preexisting works underlying an alleged derivative work.

Regardless of the burden of proof, Appellants *did* offer evidence that they

34

never authorized the creation of copyrightable derivative works. Each of the Appellants testified that they entered into license agreements (since expired) with other record companies to reproduce and distribute their pre-72 recordings on re-issue and compilation albums, without the right to make any substantial changes or to prepare derivative works from any of their recordings. (ER 1150-54, 1168-72, 1141-45, 1159-63). Two of Appellants' licensees confirmed that Appellants' grant of rights were limited to reproduction and distribution in "re-issues" and "compilations" and did not include any right to create derivative works. (ER 1134-36, 1177-79).

Despite this undisputed testimony, which should have been dispositive, the district court dealt with it by—striking all the evidence. (ER 16). First, the court found that the witnesses lacked "personal knowledge." But under the Federal Rules of Evidence, personal knowledge may be established through a "witness's own testimony." Fed. R. Evid. 602. And each witness testified that he had personal knowledge of the licenses and that no one had authorized the creation of any derivative works from Appellants' pre-72 recordings. (ER 1151-52, 1167-68, 1142-43, 1160-61, 1135-36, 1178-79). Although the district court found that each witness admitted in his deposition a lack of personal knowledge regarding the licenses, the witnesses made no such admissions. (ER 330-349, 175-77, 193-94, 218-19). Instead, they merely testified that they did not review every license

35

before signing their declarations. That, of course, does not establish an absence of personal knowledge regarding their companies' licenses. Moreover, the district court did not address the testimony of Appellants' licensees (Messrs. Johnson and Emmer), who both confirmed that the licenses did not authorize the creation of derivative works. (ER 1177-79, 1134-36).

Second, the court struck the testimony on the ground that the licenses were the "best evidence" of their terms, and Appellants had not offered the licenses—numbering in the hundreds—into evidence. (ER 16). In support, the court cited *Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 525 (7th Cir. 2009), which found that an affidavit describing a single license agreement was not the "best evidence" of the agreement's terms. In contrast, this case involves potentially many hundreds of license agreements—most of which have long since expired. Where voluminous writings are at issue, which cannot be conveniently examined by the court, the Federal Rules of Evidence allow use of a summary to prove the content. Fed. R. Evid. 1006. In such circumstances, courts have accepted affidavits summarizing the content of voluminous writings in opposing summary judgment motions, so long as the underlying documents are made available. *Case & Co. v. Board of Trade*, 523 F.2d 355, 360 (7th Cir. 1975).

Here, Appellants produced to CBS the license agreements in question and CBS offered no evidence disputing their content. Thus, the court should have

accepted the testimony as creating, at the very least, a triable issue of fact regarding whether Appellants authorized the creation of federally-governed derivative works.

### 2. The remastered copies contained no original new material "substantially different" from the original recordings.

#### a. New material must be substantially different from the underlying work to qualify for a derivative copyright.

To qualify for a federal copyright as a derivative work, new material must be both original and creative. *Durham Indus. v. Tomy Corp.*, 630 F.2d 905, 908-09 (2d. Cir. 1980). While the originality and creativity in the changes to the underlying original work need not be great, to qualify as a derivative work the new material must be "substantially different" from the original. *Id*. at 910 ("[T]o be copyrightable a [derivative] work must 'contain () some substantial, not merely trivial, originality . . . .'") (quoting *L. Batlin & Sons, Inc. v. Snyder*, 536 F.2d 486, 513 (2d. Cir. 1976) (en banc)); *Gracen v. Bradford Exchange*, 698 F.2d 300, 305 (7th Cir. 1983) ("[A] derivative work must be substantially different from the underlying work to be copyrightable"). For this reason, changes in format or media alone never suffice to create a derivative work, *Durham*, 630 F.2d at 909, and a derivative work cannot be created if the entire underlying work is copied within the reproduction. *Capitol Records, Inc. v. Naxos of Am., Inc. (Naxos III)*, 4 N.Y.3d 540, 564 (2005).

37

The Ninth Circuit follows this rule by applying a two-part test for derivative works: "(1) the original aspects of a derivative work must be more than trivial and (2) the original aspects of a derivative work must reflect the degree to which it relies on preexisting material and must not in any way affect the scope of any copyright protection in that preexisting material." *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012). Without the second prong, an owner of the underlying work would "effectively be prevented from permitting others to copy her work since the original derivative copyright holder would have a de facto monopoly due to her 'considerable power to interfere with the creation of subsequent derivative works from the same underlying work.'" *Entm't Research Grp. v. Genesis Creative Grp.*, 122 F.3d 1211, 1220 (9th Cir. 1997) (internal citation omitted).

> **b. Computer-generated adjustments to sound quality when converting a sound recording format does not qualify for derivative work copyright protection.**

Applying these rules, courts have found that state law (and not federal copyright) continued to govern pre-72 recordings contained in remastered copies or re-recordings, even when the originally-fixed sounds were altered. As discussed, *Naxos*, *supra*, involved pre-72 shellac recordings restored into digital format in which substantial adjustments to sound, using "the latest digital software," were made "to create an entirely new and commercially viable

38

product…." *Naxos I*, 262 F. Supp. 2d at 208-09, 214-15. In response to a certified question from the Second Circuit, the New York Court of Appeals held that Naxos' digitally re-mastered copies were "pre-72 recordings" subject to New York common law—not derivative works subject to federal law: *Naxos III*, 4 N.Y.3d at 564-65 (finding that remastering pre-72 sound recordings in a way that "enhances sound quality" cannot defeat a common-law copyright claim "to the extent it utilizes the original elements of the protected performance").

Similarly, *Taxe*, *supra*, involved the alteration of pre-72 recordings by "speeding up the sounds, slowing down the sounds, deleting certain frequencies or tones or adding echoes or sounds from a moog synthesizer…." *Taxe*, 380 F. Supp. at 1013. But the court found that these changes did not suffice to convert the pre-72 recordings into post-72 derivative works that could be prosecuted for federal copyright infringement. *Id*. at 1016.

> **c.** **The district court erred in finding that the computer generated adjustments to Appellants' pre-72 recordings created derivative works.**

The district court found that the computer-generated adjustments to certain sound characteristics—adjustments available with the digital format used in the conversion from analog tape to CD—resulted in the creation of derivative works. (ER 14). But the digitally remastered copies of Appellants' pre-72 recordings contained no more adjustments than the recordings at issue in *Naxos* and *Taxe*.

Despite this, the district court found *Naxos* distinguishable and declined to apply *Taxe* without explanation. *Naxos*, according to the court, did not apply because that case "did not address whether any original expression was added during the remastering process, and because the remastered works were created "without authorization." (ER 13-14). But the *Naxos* district court opinion confirmed that significant differences existed between the shellac recordings and the digitally remastered copies. *Naxos I*, 262 F. Supp. 2d at 208-09, 214-15 ("The quality and nature of the restorations stand as evidence to the fact that Naxos did not aim to simply duplicate the original recordings and capitalize on Capitol's efforts. Instead, Naxos worked to create a new product with superior sound"). As to authorization, the *Naxos* district court also confirmed that the defendants did not need authorization to create derivative works because defendant had created them in the United Kingdom where, unlike the United States, the underlying works were in the public domain. *Id.* at 474, 479-80. In any event, whether an owner of a pre-72 recording authorizes the creation of a derivative work lacks relevance to whether computer-generated changes can suffice to create a derivative work. Thus, *Naxos* (as does *Taxe*) compels a finding that the adjustments to the sounds in Appellants' pre-72 works do not qualify as derivative works.

Besides not applying these precedents, the district court applied the wrong test. Rather than use the "substantial difference" test for derivative works,

40

*Durham*, 630 F.2d at 910, the district court focused on the "originality" of the alleged new material in the digital copies on CBS's servers—ultimately concluding "that there is no genuine dispute that, during the remastering process, at least some perceptible changes were made to Plaintiffs' Pre-72 Sound Recordings." (ER 13). But whether a work based on preexisting material has "perceptible changes" (however measured) is not the test for a derivative work—and lacks any legal relevance to whether the digitally remastered copies containing Appellants' underlying pre-72 recordings (and nothing else) qualify as derivative works. Applying the correct test, CBS's evidence fell well short of demonstrating that the recordings found on the CBS servers were "substantially different" from the Appellants' underlying pre-72 recordings.

First, CBS offered a declaration from William Inglot, a former Rhino sound engineer. Mr. Inglot testified that he remastered some of Appellants' pre-72 recordings for Rhino, but did not know whether any of those remastered copies included the copies that CBS transferred onto its servers. (ER 910-11). Even then, Mr. Inglot admitted that he never altered Appellants' pre-72 recordings by remixing, editing, re-sequencing, adding sounds, or deleting sounds. (ER 913-15, 919-20). While Mr. Inglot declared that he made "significant and noticeable alternations and modifications" during the remastering process, (ER 1299-1300), he admitted that he could not recall any specific change to a particular recording

41

and that his "modifications" amounted to nothing more than "doing a good job" according to his subjective determination (ER 924). In other words, without disturbing or changing at all any of the musical components of the work, he just computer manipulated existing components to enhance what was previously created when rendered in a digital format.[5] Thus, Mr. Ingot's declaration provided no evidence of a substantial difference.

Second, CBS offered a declaration from Durand Begault, an acoustic engineer. But Dr. Begault's testimony offered nothing more compelling. Dr. Begault compared the copies on CBS's servers with Appellants' pre-72 recordings for "timbre, special imagery, sound balance, and loudness range," (ER 10)—none of which have ever been used in determining whether a recording qualifies as a derivative work. (ER 932-33)[6]. Dr. Begault admitted that his tests were designed

---

[5] Mr. Inglot's testimony is consistent with Mr. Emmer's testimony (Rhino's Executive Vice President) that Appellants did not authorize the creation of derivative works. (ER 1135-36).

[6] Dr. Begault also conducted a "critical listening" test to confirm whether the songs he compared were the same performance. Oddly, the district court struck the declaration of Appellants' music technology expert, Paul Geluso, (ER 284-567) in part for conducting the same "critical listening" test. (ER 12 (citing Fed. R. Evid. 702)). The district court also criticized Mr. Galuso for omitting the results of "phase inversion testing," which only determines whether two digital recordings are identical on a bit level—which Mr. Geluso abandoned as unnecessary because he knew that the different recording techniques used to create each recordings he compared would reveal bit differences in every test. Finally, the district court struck Mr. Geluso's testimony because he asked to see his workstation graphs during this deposition, and because he compared only five second portions of the

42

to determine only whether the songs compared were "recorded at the same time and with the same application of recording engineering techniques." (ER 928). Indeed, Dr. Begault's tests "failed" if *any* differences existed in any of the four tests, even a 1decibel change in "loudness"—an amount imperceptible to the human ear. (ER 1443). In other words, Dr. Begault tests were not designed to look for substantial differences; only whether two copies of a song were identical. But his tests did confirm that Appellants' pre-72 recordings were embodied in the copies on CBS's servers, (ER 939-40), and that none of Appellants' recordings had been remixed, edited, resequenced, or had sounds added or deleted (ER 935, 937-38).

Nor do Dr. Begault's "tests" make any sense for determining whether a recording qualifies as a derivative work. The decisions of a sound engineer during recording may be creative, but turning a knob on a computer board produces no more of a substantially different "original work" beyond the existing underlying recording than adjusting the "loudness" on a stereo. In fact, nearly everything that was done to adjust the sounds on Appellants' analog recordings after their conversion to the CD format can be done to digital files today on a smart phone

---

recordings. (*Id.*) Striking Mr. Galuso's testimony for asking to see his workstation graphs is inexplicable; striking based on the use of a five second comparison is unwarranted because the five seconds were amply sufficient to support Mr. Geluso's conclusion (undisputed by CBS) that Appellants' pre-72 recordings were embodied in the copies on CBS's servers.

with a music application like "Garage Band." If any minor adjustments to preexisting sounds in an underlying work could create a new derivative work—and that is all that Dr. Begault's tests proved—then converting digital files from CD to MP3 alone would qualify, because that process lowers the sound quality. Yet it is settled that a changing format alone does not create a derivative work. *Durham*, 630 F.2d at 909.[7]

Likewise, the digital adjustments made during the conversions cannot form the basis of a derivative work because any derivate work copyright in the sound recordings on the CDs would affect Appellants' state law rights in their preexisting pre-72 recordings. *U.S. Auto Parts Network,* 692 F.3d at 1016. This case alone demonstrates that Appellants' state law rights in their pre-72 recordings, including the right to license the creation of copies in formats for future technologies, would be curtailed if a derivative work copyright existed in the copies residing on CBS's servers. If someone owned a derivative work copyright in those copies, it would be risky for anyone else to create new derivative works from Appellants' analog

---

[7] In any event, Dr. Begault compared the wrong things. He did not compare Appellants' original analog master recordings with the digitally remastered copies embodied on the CDs ripped by CBS. Instead, he compared digital copies of Appellants' master recordings with whatever existed on CBS's servers in 2016. Some of the differences that Dr. Begault observed could have been created when the CDs were loaded onto CBS's servers—or even after. Changes to sound quality as a result of copying onto CBS's servers or after they were copied onto the servers cannot be the basis for a derivative work copyright.

44

master recordings.  Any licensee of these new works from Appellants' pre-72 recordings could face potential federal liability from whoever owned the derivative work copyright on the recordings that CBS broadcasts over the air and the Internet. *Entm't Research Grp.*, 122 F.3d at 1220.

None of the district court's authorities hold otherwise.  The court cited the United States Copyright's Office Circular No. 56.  But Circular 56 does not "have the force of statute," *Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541, 544 (2d Cir. 1959), and does not accurately reflect the law because it omits the "substantially different" standard.  But even under the Circular, the remastered copies do not qualify as derivative works.  According to the Circular, a derivative work requires that the preexisting sound "have been rearranged, remixed, or otherwise altered in sequence or character, or there must be some additional new sounds."  Yet Dr. Begault admitted that his tests showed no such changes.  (ER 935, 937-38).  Similarly, the Circular indicates that a remastered copy can qualify for a derivative work copyright if it involves "multiple kinds of creative authorship, such as adjustments to equalization, sound editing, and channel assignment."  Dr. Begault, in contrast, concluded that the recordings compared differed if any *one* of timbre, spatial imagery, balance, or loudness showed even a

45

trivial change on a computer display—no matter whether it could be detected by a human.  (ER 1429-43).[8]

Finally, *Maljack* provides no support for the court's conclusion that the computer-based adjustments to Appellants' pre-72 recordings created derivative works.  (ER 13 (citing *Maljack Prods., Inc. v. UAV Corp.*, 964 F. Supp. 1416, 1418 (C.D. Cal. 1997)).  *Maljack* did not involve either remastered or pre-72 recordings. Instead, *Maljack* involved a 1993 "pan and scan" edited version of the 1962 motion picture McClintock!, created to prepare the film for video distribution and television.  In creating the 1993 version, in addition to the "pan and scan" changes, the plaintiff significantly edited and changed the film's soundtrack by remixing, resequencing, sweetening, equalizing, balancing and stereoizing it, and also adding entirely new sound material.  *Id.* at 1418.  In a challenge to the plaintiffs' copyright registration of the "pan and scan" version, the district court found the film, inclusive of the soundtrack, subject to federal copyright protection because (taking into account the copyright registration's presumption of validity) it was part of a

---

[8] The district court found that "many of the remastered versions included different channel assignment and adjustments to equalization."  (ER 14)  In support, the court cited only four paragraphs in Dr. Begault's declaration in which he discusses just four of Appellants' pre-72 recordings.  (*Id*. (citing Begault Decl. ¶¶ 77, 80, 85, 91)).  Despite relying on only four recordings discussed in the cited paragraphs, the court still granted summary judgment as to *all* the recordings at issue.  Even as to the four recordings—while Dr. Begault found differences in equalization—Dr. Begault never mentions "channel assignment" in the cited paragraphs, or anywhere else in his declaration.  (ER 1455-56, 1458-59, 1462-63, 1467-68).

new audio-visual work.  But the court did not find that the copyright registration extended to original elements of McClintock!.  Rather, the court found only that the "pan and scan" version and "the sound enhancements are new material protected by copyright."  *Id.* at 1428.  In contrast to *Maljack*, there is no evidence that the remastered copies of Appellants' pre-72 recordings contain anything close to the sound enhancements that were added to the McClintock! soundtrack.

C.   **The District Court Erred In Granting Partial Summary Judgment On The Ground That CBS Did Not Play The Recordings In California.**

The district court found that, even if Appellants' retained their state law rights in their pre-72 recordings, CBS was still entitled to summary judgment as to 126 out of the 174 exemplary recordings at issue because Appellants did not meet their burden of proving that CBS had publicly performed Appellants' recordings in California.  (ER 18-20).  In reaching this conclusion, the court struck as "hearsay" the Triton reports, which track everything CBS plays in California.  (ER 19).  But the Triton reports easily qualify as business records and, at the very least, created a genuine issue of fact regarding what CBS played in California.

1.   **The Triton reports were admissible under the business records exception to the hearsay rule.**

The district court abused its discretion when it struck the voluminous records compiled by Triton (ER 582-84; 707-08; 714-889), which show exactly what CBS played in California during the relevant time period.  (ER 18-19).  According to the

47

court, Appellants failed to establish "any of the requirements" necessary for the Triton reports to be admitted under the business records exception. Contrary to this finding, Appellants demonstrated each requirement for the business records exception.

Under Fed. R. Evid. 803(6), a business record is not subject to exclusion under the hearsay rules if shown, by the testimony of the custodian or another qualified witness, that: (1) a record of an act, event, condition, opinion, or diagnosis "was made at or near the time by — or from information transmitted by — someone with knowledge"; (2) the record was "kept in the course of a regularly conducted activity of a business"; (3) making the record was "a regular practice of that activity"; and (4) if CBS does not show that "the source of the information or the method or circumstances of preparation indicate a lack of trustworthiness." F.R.E. 803(6). There is no requirement that the party offering a business record produce the author of the item. *FDIC v. Staudinger*, 797 F.2d 908, 910 (10th Cir. 1986). Rather, "the phrase 'other qualified witness' is broadly interpreted to require only that the witness understand the record-keeping system." *United States v. Ray*, 920 F.2d 562, 565 (9th Cir. 1990).

Appellants established all of the requirements of the business records exception through Seth Neiman's testimony. Mr. Neiman is a "qualified witness" under Fed. R. Evid. 803(6), because his testimony establishes that he understood

48

the record-keeping system of the Triton reports—that Triton prepared the reports, that CBS provided the reports to SoundExchange (a non-profit entity that collects and distributes royalties for the digital public performance of *post*-72 recordings), and that the reports were stored electronically by CBS. (ER 637-39).

Further, Mr. Neiman's testimony that CBS stored the Triton reports and relied on them for royalty reporting purposes to SoundExchange (ER 1034; 637-40) establishes the requirements of Fed. R. Evid. 806(3). *See U.S. v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (finding dealership's business records admissible despite fact that dealership did not create the records, because records were kept in the regular course of business at dealerships, dealerships relied on the information contained in them and had a substantial interest in their accuracy). Tellingly, CBS never contended that the information in the Triton reports was untrustworthy, and the court never addressed that issue. (ER 19; 113-14). Thus, the records should have been admitted.

### 2. The Triton reports show that CBS played Appellants' pre-72 recordings in California during the relevant time period.

In justifying its decision to exclude the Triton reports, the court further held that, even if admissible, the Triton reports cannot create a genuine dispute of material fact that CBS performed Plaintiff's pre-72 recordings, because the reports only demonstrate that "CBS publicly performed a sound recording which has the same title and artist as one of the works owned by Plaintiffs," and "the Court

49

cannot conclude that CBS performed a pre-72 recording owned by Plaintiffs from nothing more than a song title and artist listed in a report." (ER 19). Besides usurping the jury's fact-finding function, the court incorrectly accepted CBS's unsupported assertion, (ER 100-01), that the Triton reports included only the song name and artist. (ER 19). The Triton reports plainly include the album title and, in some cases, the album's marketing label—identifying with particularity the exact recordings CBS performed. (ER 714-889). With this additional information, overlooked by the district court, a jury could conclude that the works publicly-performed by CBS were in fact owned by Appellants, as even CBS concedes (ER 101). In any event, CBS offered no evidence to the effect that the recordings contained performances fixed after 1972 even though it had the burden on summary judgment to establish the absence of a dispute as to this material fact. Fed. R. Civ. P. 56(a).[9]

### D. The District Court Abused Its Discretion By Denying Class Certification

Local Rule 23-3 required that Appellants file a motion for class certification within 90 days after service of the complaint—making the deadline November 19, 2015. After the district court twice denied stipulations to extend that date so that

---

[9] Further, the district court did not address CBS's violation of Appellants' state law rights for illegally reproducing Appellants' pre-72 recordings when it copied them onto its servers in California, and distributing those copies—regardless of whether CBS publicly performed them.

Appellants could conduct needed class certification discovery—and denying the second stipulation without explanation on the November 19 due date (ER 2886-87)—Appellants timely filed a Motion to Certify Class Action. (ER 2808-2885). Although timely filed, the district court struck the entire motion because of two trivial defects in the "notice" of the motion—(1) noticing the matter for hearing beyond the 35 day period set forth in the Judge's Standing Order, and (2) not including the Local Rule 7-3 statement that a "conference of counsel" took place prior to filing the motion. (ER 2806). After striking the motion based on defects in the "notice," the court struck all class allegations from the claim for failing to timely file the motion. (ER 2806-07). The district court's action was an abuse of discretion and should be reversed.

First, neither authority cited by the district court involved striking a timely-filed class certification motion based on the motion's notice—rendering the motion untimely. The district court cited *Burkhalter v. Montgomery Ward & Co.*, 676 F.2d 291 (8th Cir. 1982). In that case, the plaintiff delayed filing a court-ordered motion for class certification for over two months. *Id*. at 294. The court also cited *Joseph N. Main P.C. v. Electronic Data Sys. Corp.*, 168 F.R.D. 573 (N.D. Tex. 1996). In that case, the plaintiff missed the local rule deadline for filing a class certification motion in an action removed from state court. *Id*. at 577.

51

Second, even though the notice of the motion omitted the Local Rule 7-3 statement regarding the conference of counsel, the district court knew that the parties had repeatedly conferred on the class certification issue and that a noticed motion was required to resolve whether the proposed class should be certified. Indeed, the parties filed two stipulations to extend the deadline for filing the class certification motion. (ER 2898-901, 2888-92). In similar cases, courts have accepted motions omitting the Rule 7-3 statement. *See Munchoff v. Munchoff*, 2015 U.S. Dist. LEXIS 118012, at *6-7 (C.D. Cal. Sep. 3, 2015) (finding that plaintiff complied with the "heart and spirit" of L.R. 7-3, even though plaintiff failed to include the required statement, because the parties had, in fact, conferred). In any event, the conference of counsel, designed to avoid unnecessary motion practice, was superfluous in this case because the rules mandated the filing of a class certification motion regardless of any conference. Fed. R. Civ. P. 23; LR 23-3.

A district court's inherent powers to control its docket include the power to strike items from the docket. *Atchison, Topeka & Santa Fe Ry. v. Hercules, Inc.*, 146 F.3d 1071, 1074 (9th Cir. 1998); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 586-87, 588 (9th Cir. 2008). Normally, courts invoke this power as a sanction for litigation misconduct or for violating jurisdictional rules. *Atchison*, 146 F.3d at 1074; *Victor F. v. Pasadena Independent School Dist.*, 793 F.2d 633, 635 (5th Cir.

52

Tex. 1986) ("This is not a case where plaintiffs served notice within the sixty-day time period prescribed by Rule 4(a)(5) but failed to attach a certificate of service reflecting such service had been made. Plaintiffs did not give notice of their motion").

Here, Appellants plainly did not engage in misconduct or even fail to file the class certification motion within the local rule time period. Indeed, Appellants were exceptionally diligent in meeting the local rule deadline even when the district court denied, on the deadline date, the parties' stipulation to extend the deadline so they could conduct pre-certification discovery. In a similar case, the Ninth Circuit found an abuse of discretion where the district court denied a stipulation (without explanation) to extend the class certification deadline to the parties could engage in pre-certification discovery—and then denied the class certification motion for lack of evidence. *Perez v. Safelite Group Inc.*, 2014 U.S. App. LEXIS 4353, *2 (9th Cir. 2014) (unpublished).[10]

---

[10] *See also Balser v. Hain Celestial Grp., Inc.*, 640 Fed. Appx. 694, 696 (9th Cir. Cal. 2016) (unpublished) ("We note that the schedule contemplated by Central District of California Local Rule 23-3, when considered alongside federal rules regarding status conferences and the timing of discovery, is quite unrealistic in light of recent case law regarding the need to establish a sufficient factual record at the class certification stage").

Appellants respectfully submit that the ability to proceed as a class action should not have been summarily eliminated based on two, trivial oversights in the notice of an otherwise timely-filed motion for class certification.

## VII. CONCLUSION AND RELIEF REQUESTED

For all of these reasons, Appellants respectfully request that the district court's summary judgment order and its decision denying class certification and appointment of interim class counsel be reversed.

Date: February 16, 2017          Respectfully submitted,


/s/ Lawrence M. Hadley

Lawrence M. Hadley
*Principal Counsel*
McKOOL SMITH HENNIGAN, P.C.
300 S. Grand Avenue, Suite 2900
Los Angeles, CA 90071
(903) 923-9000


*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing BRIEF OF APPELLANT ABS ENTERTAINMENT, INC., ET AL:

1.     complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B). This brief contains 12,549 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii) and Ninth Circuit Rule 32-1. Microsoft Word 2010 was used to calculate the word count.

2.     complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6). This brief has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point Times New Roman type style.

Date: February 16, 2017

/s/ Lawrence M. Hadley

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit R. 28-2.6, Appellants ABS Entertainment, Inc., Barnaby Records Inc, Brunswick Record Corporation, Malaco Inc, respectfully state that there are no other related cases pending in this Court.

**CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2017, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

  s/  Kirstin E. Largent