No. 16-55917

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

ABS ENTERTAINMENT, INC., ET AL
*Plaintiff-Appellant*,

v.

CBS CORPORATION, ET AL
*Defendant-Appellee*.

_____

Appeal from the United States District Court
for the Central District of California

The Honorable Percy Anderson

District Court Case No. CV 15-6257 PA (AGRx)
_____

# BRIEF OF *AMICUS CURIAE* FLO & EDDIE, INC. IN SUPPORT OF
# PLAINTIFF-APPELLANT AND REVERSAL
_____

HENRY GRADSTEIN
MARYANN R. MARZANO
DANIEL B. LIFSCHITZ
GRADSTEIN & MARZANO, P.C.
6310 San Vicente Boulevard, Suite 510
Los Angeles, California 90048
(323) 776-3100

STEPHEN E. MORRISSEY
STEVEN G. SKLAVER
KALPANA SRINIVASAN
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, CA 90067
(310) 789-3100

*Attorneys for Flo & Eddie, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Amicus

Curiae Flo & Eddie, Inc. ("Flo & Eddie") hereby states that it has no parent

corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: February 23, 2017        Respectfully submitted,

By:   /s/ Henry Gradstein

GRADSTEIN & MARZANO, P.C.
Henry Gradstein
Maryann R. Marzano
Daniel B. Lifschitz

SUSMAN GODFREY L.L.P.
Stephen E. Morrissey
Steven G. Sklaver
Kalpana Srinivasan

Attorneys for *Amicus Curiae*
FLO & EDDIE, INC.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ..................................................... i

TABLE OF AUTHORITIES ............................................................... iii

I. STATEMENT OF INTEREST ....................................................... 1

II. INTRODUCTION ................................................................ 2

III. FACTUAL AND PROCEDURAL HISTORY ........................................... 6

     A. The Historical Protection of Sound Recordings ............................... 6

     B. Flo & Eddie's Litigation Against Sirius XM Concerning Pre-1972 Recordings ............................................................... 12

     C. *ABS Entertainment v. CBS Corporation* ..................................... 14

IV. ARGUMENT .................................................................. 15

     A. The District Court's Ruling Violates Section 301 of the Copyright Act and Misapplies the Settled Law of Derivative Works ..................... 15

     B. The District Court's Ruling Threatens to Cause Widespread Legal Uncertainty and Undermine the Rights of Artists ........................... 18

V. CONCLUSION ................................................................ 21

# TABLE OF AUTHORITIES

*ABS Entm't, Inc. v. CBS Corp.*,
   2016 U.S. Dist. LEXIS 71470, (C.D. Cal. May 30, 2016) ....................5

*Bonneville Int'l Corp. v. Peters*,
   347 F.3d 485 (3d Cir. 2003) ................................9

*Capitol Records, Inc. v. Mercury Records Corp.*,
   221 F.2d 657 (2d Cir. 1955) ................................10

*Classic Media, Inc. v. Mewborn*,
   532 F.3d 978 (9th Cir. 2008) ................................19

*Davis v. E.I. DuPont deNemours & Co.*,
   240 F. Supp. 612 (S.D.N.Y. 1965) ....................17

*DC Comics v. Towle*,
   802 F.3d 1012 (9th Cir. 2015) ................................16

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
   2015 U.S. Dist. LEXIS 98656 (C.D. Cal. May 27, 2015) ....................13

*Flo & Eddie. Sirius XM Radio Inc.*,
   2014 U.S. Dist. LEXIS 139053 (C.D. Cal. Sep. 22, 2014) ................13

*Goldstein v. Cal.*,
   412 U.S. 546 (1973)................................7, 8, 10

*Lone Ranger Television, Inc. v. Program Radio Corp.*,
   740 F.2d 718 (9th Cir. 1984) ................................10

*Mills Music, Inc. v. Snyder*,
   469 U.S. 153 (1985)................................20

*New York Phonograph Co. v. Edison*,
   136 F. 600 (C.C.S.D.N.Y. 1905) ................................7

*Newton v. Diamond*,
   204 F. Supp. 2d 1244 (C.D. Cal. 2002) ................................1

iii

*Pryor v. Jean*,
   2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014).............................17, 18

*RCA Mfg. Co. v. Whiteman*,
   114 F.2d 86 (2d Cir. 1940) ...................................................................................10

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
   206 F.3d 1322 (9th Cir. 2000) .............................................................................10

*Stewart v. Abend*,
   495 U.S. 207 (1990) .............................................................................................15

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
   692 F.3d 1009 (9th Cir. 2012) .............................................................................16

*Waring v. WDAS Broadcasting Station, Inc.,*
   327 Pa. 433 (1937)........................................................................................8, 9, 12

*White-Smith Music Publishing Co. v. Apollo Co.*,
   209 U.S. 1 (1908)...................................................................................................7

## STATUTES

17 U.S.C. § 103(b) .........................................................................................................3

17 U.S.C. § 114.............................................................................................................17

17 U.S.C. § 301(c) ................................................................................................4, 11, 17

Pub. L. 92-140, 85 Stat. 391 (1971).............................................................................10

## OTHER SOURCES

Zvi S. Rosen, *Common Law Copyright*, U. Cin. L. Rev. (forthcoming),
   *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2834199 ............6

Melville B. Miller and David Nimmer, Nimmer on Copyright (2015) ..........16, 18

Nielsen, 2016 Music U.S. Mid-Year Report (July 7, 2016), available at
http://www.nielsen.com/content/dam/corporate/us/en/reports-
downloads/2016-reports/us-mid-year-report-july-2016.pdf (last visited
Feb. 23, 2017) ..........................................................................................................12

Flo & Eddie, Inc. ("Flo & Eddie") respectfully submits this brief as *amicus curiae* in support of appellant ABS Entertainment, Inc.'s ("ABS") appeal from the district court's May 30, 2016 order granting appellee CBS Corporation, Inc.'s ("CBS") motion for summary judgment.[1] Pursuant to Fed. R. App. Proc. 29(a)(2), counsel for all parties have consented to Flo & Eddie's filing of this brief.

## I. STATEMENT OF INTEREST

Flo & Eddie is an owner of many iconic sound recordings originally fixed before February 15, 1972 ("pre-1972 recordings"[2]) and the class representatives in the landmark case of *Flo & Eddie, Inc. vs. Sirius XM Radio, Inc.,* Case No. CV13-05693 (C.D. Cal.). Flo & Eddie submits this brief to address the fundamental errors in the district court's ruling interpreting the provisions of the federal Copyright Act pertaining to sound recordings and derivative works. In addressing these errors, Flo & Eddie also provides its perspective on the history of protection afforded to pre-1972 recordings (which Flo & Eddie's principals have personally witnessed during their more than 40 years owning and exploiting pre-1972 recordings). Flo & Eddie believe that the fundamental errors in the district court's opinion warrant reversal.

---

[1] Pursuant to Fed. R. App. Proc. 29(c)(5), Flo & Eddie states that this brief was not authored in whole or in part by any party's counsel, and no party, party's counsel, or other person contributed money to the preparation and submission of this brief.

[2] Pre-1972 recordings—the result of fixation of a specific performance of a song—are distinct from the underlying song—the musical compositions embodied therein. *See Newton v. Diamond*, 204 F. Supp. 2d 1244, 1248-49 (C.D. Cal. 2002); Section II, *infra.* Federal copyright law has a long history of protecting songs, regardless of date of creation. Songs are not at issue in this litigation.

At a minimum, the district court's ruling should be interpreted to apply narrowly to the facts and record presented in the underlying case, as the district court did not address the core issue of whether the creation of a remastered derivative work would necessarily infringe the rights in the underlying original sound recording embodied in the remastered work.

## II.    INTRODUCTION

Broadcasters' exploitation of pre-1972 recordings has transformed from a practice that the owners of such recordings once relied on to enhance their own commercial exploitation to one that now practically precludes owners from monetizing their recordings. Although pre-1972 recording owners once relied on broadcaster performance to drive demand for record sales of their music—and indeed, often encouraged broadcaster performance to increase those sales—today's digital broadcasting and on-demand streaming has decimated the traditional market for recorded music sales. Because music consumers are increasingly content with just hearing the broadcast itself, broadcasters have transformed from business allies to the direct competitors of owners of pre-1972 recordings. Yet the broadcast industry continues to exploit and monopolize monetization of pre-1972 recordings—in many cases without the permission of the pre-1972 recordings' owners, who maintain "exclusive ownership" of those recordings under California law.

2

In 2013, Flo & Eddie sought to correct this inequity by filing suit on behalf of all owners of pre-1972 recordings against the single largest digital broadcaster infringing the rights of pre-1972 recording owners, Sirius XM Radio, Inc. ("Sirius XM"). After Flo & Eddie obtained a summary judgment ruling in the Central District of California holding Sirius XM liable for performing pre-1972 recordings without authorization, the certified class achieved an historic settlement, resolving the California case and two parallel proceedings brought under New York and Florida law. The settlement, subject to final approval, provides not only retroactive damages, but also ongoing royalties for Sirius XM's performances of class members' pre-1972 recordings should Sirius XM lose certain extant appeals addressing whether it is entitled to publicly perform class members' pre-1972 recordings without authorization going forward.

The district court's ruling in this case accepted a defense based on the contention that the application of federal copyright protection to remastered pre-1972 recordings removed any issue as to whether public performance of the remastered recordings violated state copyright law. However, under federal copyright law, the new copyright protection accorded to a post-1972 derivative work, such as a remastered pre-1972 recording, covers *only the additional original and independent elements* that have been added to the base work—not the pre-1972 recording so embedded in the derivative work. 17 U.S.C. § 103(b). The

3

underlying rights in the original pre-1972 recording remain intact, and the unauthorized performance of a derivative work violates those rights—just as the exploitation of any work derivative to a federally protected work requires a license to the original work.

Although the district court acknowledged these basic tenets of copyright law, it erred in its application by holding that a broadcaster's performance of a remastered, post-1972 derivative recording is governed exclusively by federal copyright law. This cannot be, as Congress expressly reserved exclusive protection of pre-1972 recordings to the individual states. Contrary to the district court's ruling, state copyright protection remains intact even when a pre-1972 recording is remastered into a post-1972 derivative recording. The federal derivative copyright protection—which protects only the original and independent expression added to the remastered version—does not subsume the state protection of the underlying pre-1972 recording. Rather, the derivative copyright provides an *additional* layer of copyright protection for the creative authorship incorporated into the remastered version. This is the only outcome consistent with the Congressional directive contained in Section 301 of the Copyright Act, which *prohibits* the abridgment of state law protections for pre-1972 recordings. 17 U.S.C. § 301(c).

Regardless of whether the district court observation that the "original expression added by a sound engineer during the remastering process" entitles a

post-1972 remastered work to federal copyright protection as a derivative work, *ABS Entm't, Inc. v. CBS Corp.*, 2016 U.S. Dist. LEXIS 71470, No. CV 15-6257 PA, at *29, n.10 (C.D. Cal. May 30, 2016) ("*ABS*"), was correct, that observation did not answer the question of whether the public performance of such a derivative work would violate the rights in the underlying pre-1972 recording. It would, and for that reason the district court's ruling should be reversed.

Moreover, it is by no means clear—and certainly does not appear to have been sufficiently clear for the issue to have been resolved on summary judgment—that the kinds of remastering at issue here actually result in the creation of federally protected derivative works or, indeed, any material alteration to the original pre-1972 recording that Congress determined should be protected by state law. Broadly assuming that any remastered recording by a sound engineer constitutes a derivative work, combined with the district court's improper holding that such works are governed exclusively by federal copyright law, would eviscerate any state law protection of the underlying pre-1972 recordings, given the near ubiquity of remastering in the current digital age.

The district court's finding that a commonly used remastering process results in the creation of derivative works also has the troublesome effect of allowing recording owners to artificially truncate the duration of state copyright protection (while extending federal copyright protection) merely by creating a

remaster that adds appreciably little to the underlying recording. The district court's ruling invites assignees of sound recordings to create new remastered versions of the recordings before their interests in the original versions are terminated in order to continue their exploitation. Allowing such an artificial extension of the ability to commercially exploit recordings otherwise subject to statutory reversion under the Copyright Act fundamentally undermines Congress' goal in providing for termination rights in the first place.

All of these issues are avoided, however, if the Ninth Circuit reverses the district court's ruling and issues an opinion consistent with established copyright law. This Court should hold that the remastering of a pre-1972 recording does not destroy state law protection of the underlying sounds, which remain embodied in the remastered recording and are subject to separate licensing requirements, as would be the case with any other type of derivative work.

## III.   FACTUAL AND PROCEDURAL HISTORY

### A.    The Historical Protection of Sound Recordings

Although musical compositions have received federal copyright protection for nearly two centuries, Congress has left it entirely to the states to govern the protection of pre-1972 sound recordings.[3] Congress first granted federal copyright

---

[3] Zvi S. Rosen, *Common Law Copyright*, U. CIN. L. REV. (forthcoming), *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2834199, contains a more complete history of the protection of sound recordings in the United States ("The

protection to the creators of musical compositions in 1831. *See Goldstein v. Cal*., 412 U.S. 546, 564-65 (1973). Protection of a *sound recording* of a musical composition was not even on the horizon at the time, as the earliest commercialized version of a sound recording (the phonograph) was not even invented until decades later. *See New York Phonograph Co. v. Edison*, 136 F. 600, 602 (C.C.S.D.N.Y. 1905) (discussing the history of the phonograph).

In 1908, the Supreme Court first addressed the conceptual divide between a musical composition on the one hand and the physical embodiment of a musical composition's performance on the other hand. In *White-Smith Music Publishing Co. v. Apollo Co*., 209 U.S. 1 (1908), the Supreme Court held such physical embodiments (in that case, player piano rolls) to be outside federal copyright law's protection because they did not constitute "copies" or "publications" of the copyrighted music. 209 U.S. at 18.

Shortly after the Supreme Court decided *White-Smith*, Congress passed the 1909 Copyright Act, which provided that records and piano rolls were "copies" of the original composition and could not be manufactured without payment to the proprietor of the composition copyright. Thus, Congress ensured that composers would be compensated for the sale of such embodiments, but left for the states to

results of this study are unambiguous – common-law copyright protects an exclusive right of public performance[,]" and "[t]his fact makes it difficult to avoid the conclusion that SiriusXM, Pandora, and even terrestrial radio stations, need to pay royalties to play sound recordings protected by common-law copyright.").

provide any protection of the embodiments themselves. *Goldstein,* 412 U.S. at 564-65.

Nearly thirty years later, the Pennsylvania Supreme Court addressed for the first time the inherent right to control a radio broadcaster's use of sound recordings under state law. In *Waring v. WDAS Broadcasting Station, Inc.,* 327 Pa. 433 (1937), the court held that a radio station's unlicensed broadcast of recordings of an orchestra's concert performances violated the orchestra's rights to dictate the use of those recordings under state common law. In so holding, the court noted that the orchestra "definitely added something to the work of [the underlying musical compositions'] authors and composers which not only gained for themselves enduring fame but enabled them to enjoy financial rewards from the public in recognition of their unique genius." *Id.* at 440. The court further explained that "[a] musical composition in itself is an incomplete work," as "it is the performer who must consummate the work by transforming it into sound. If, in so doing, he contributes by his interpretation something of novel intellectual or artistic value, he has undoubtedly participated in the creation of a product in which he is entitled to a right of property, which in no way overlaps or duplicates that of the author in the musical composition." *Id.* at 441.

The *Waring* court's decision reflects the importance of considering market effect when evaluating the propriety of a sound recording's public performance. In

8

finding for the plaintiff—whose orchestra had exclusively licensed its live performances to one radio station—the court observed that the radio station's "constant broadcasting of the records diminished the commercial value of the [plaintiff's] performances." *Id.* at 455. The court thus recognized the power that a radio broadcaster had to unfairly compete with professional musicians by deciding to "appropriate and utilize for its own profit the musical genius and artistry of plaintiff's [performances] in commercial competition with the [plaintiff] itself." *Id.* at 453.

The years following *Waring* brought about significant evolution to the music industry, and particularly the dynamic between sound recording owners and radio stations. As records became cheaper to manufacture and fell within the purchasing power of average consumers, "[t]he recording industry and broadcasters existed in a sort of symbiotic relationship wherein the recording industry recognized that radio airplay was free advertising that lured consumers to retail stores where they would purchase recordings. And in return, the broadcasters paid no fees, licensing or otherwise, to the recording industry for the performance of those recordings." *Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 487-88 (3d Cir. 2003). Recording owners simply had no incentive to enforce any restrictions on public performance

of sound recordings under state law, as it would have been financially disadvantageous to do so under the economic conditions at the time.[4]

But the financial rewards of record sales diminished with the rise of cheap phonorecord production, due to the corresponding rise in cheap phonorecord bootlegging. Congress responded by passing the Sound Recording Act in 1971, which provided prospective federal copyright protection for sound recordings initially fixed after February 15, 1972. Pub. L. 92-140, 85 Stat. 391 (1971). Congress chose not to alter the protections that older sound recordings had come to depend on under state law, however, so it left pre-1972 recordings governed by state law. *Goldstein*, 412 U.S. at 551-52. This allowed for the continued protection of pre-1972 recordings by individual states, both under common law and by statutory extension, which persists to this day. *See, e.g.*, *Lone Ranger Television, Inc. v. Program Radio Corp.*, 740 F.2d 718, 725 (9th Cir. 1984) ("Under California law, [the creator of a pre-1972 recording] would have an intangible property interest in the performances on tape from the time of their recording."); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000) ("Cal. Civ. Code § 980 extends common law copyright

---

[4] There was, for a time, some judicial uncertainty as to the ability of sound recording owners to enforce restrictions over copies of records sold to the public. *See RCA Mfg. Co. v. Whiteman*, 114 F.2d 86 (2d Cir. 1940). However, this uncertainty was resolved soon thereafter in favor of sound recording owners. *See Capitol Records, Inc. v. Mercury Records Corp.*, 221 F.2d 657 (2d Cir. 1955).

protection to sound recordings"); *see also* 17 U.S.C. § 301(c) ("With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067.").

Over the last two decades, however, the right of sound recording owners to simply prevent bootlegging has proven insufficient to compensate for revenues lost due to drastic changes within the music industry. The advent of illegal file sharing programs permitting sound recordings to be copied and instantaneously disseminated (i.e., pirated) worldwide for free has drastically diminished the market for traditional record sales, which "promotion" by radio stations does little to offset. Although the music industry partially mitigated the effects of internet piracy through the introduction of digital music stores (such as iTunes), this revenue stream was itself quickly compromised by the introduction of digital streaming services. These services, which offer varying levels of interactivity, do not require a user to purchase any specific song in order to play it, but instead are monetized through advertising, monthly subscription fees, or a combination of both. The use of such streaming services has skyrocketed every year since they were introduced, while physical and digital album sales have plummeted.[5]

---

[5] According to Nielsen's SoundScan statistics, listeners "streamed" 208.9 billion songs between January and July of 2016 alone—an increase of nearly 60 percent over those same seven months in 2015. Over the same time period, physical and

The cumulative effect of these jarring shifts in the music industry is that the music-consuming public no longer operates in an "ownership culture," whereby physical copies of recorded music are prized. Instead, consumers are increasingly content with mere access to music through broadcast means—ironically bringing the industry back to the state of competition between recording owners and broadcasters found in *Waring* some 80 years ago. This is particularly true for pre-1972 recordings, which no longer receive any "new release" benefits or perks from air play. Thus, state law protection of pre-1972 recording performances is once again vital to the economic livelihood of the owners of such recordings.

### B. Flo & Eddie's Litigation Against Sirius XM Concerning Pre-1972 Recordings

It was against this backdrop that Flo & Eddie first filed suit against digital broadcasters of pre-1972 recordings. Flo & Eddie consists of Howard Kaylan and Mark Volman, two members of the American rock band The Turtles, whose hit records throughout the late 1960s include a cover of Bob Dylan's "It Ain't Me Babe" (1965), "You Baby" (1966), "She'd Rather Be With Me" (1967), "Elenore" (1968), "You Showed Me" (1969), and the iconic "Happy Together" (1967), which is broadly recognized as a quintessential 1960s recording. For more than 40 years,

---

digital album sales declined by 12 percent, and 18 percent, respectively. Nielsen, 2016 Music U.S. Mid-Year Report (July 7, 2016), available at http://www.nielsen.com/content/dam/corporate/us/en/reports-downloads/2016-reports/us-mid-year-report-july-2016.pdf (last visited Feb. 23, 2017).

Flo & Eddie has owned and exploited the rights to The Turtles' recordings by, among other things, licensing the rights to make and sell records, licensing the rights for The Turtles' recordings to be used in movies, television shows, and commercials, and licensing the recordings to be sold digitally, including through iTunes and Amazon. Mr. Volman and Mr. Kaylan also devote significant time and effort to promoting The Turtles and their music, including by headlining summer tours such as the "Happy Together Tour," which features The Turtles and other 1960s musical groups.

On August 1, 2013, Flo & Eddie filed a lawsuit against Sirius XM, alleging on behalf of itself and a putative class of owners of pre-1972 recordings that Sirius XM was performing, distributing, and reproducing class members' recordings without license or authorization to its audience of 28 million paying subscribers. *Flo & Eddie, Inc. v. Sirius XM Radio Inc.*, Case No. CV13-05693 (C.D. Cal.). On September 22, 2014, the court found Sirius XM liable for its unauthorized public performance. *Flo & Eddie. Sirius XM Radio Inc.*, 2014 U.S. Dist. LEXIS 139053 (C.D. Cal. Sep. 22, 2014). On May 27, 2015, the Court certified Flo & Eddie's proposed class. *Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2015 U.S. Dist. LEXIS 98656 (C.D. Cal. May 27, 2015). The parties entered into a preliminary settlement agreement on November 14, 2016, the final approval of which remains pending.

The proposed settlement class includes, with certain exceptions, "[a]ll entities and natural persons, wherever situated, that are owners of Pre-1972 Sound Recordings which have been reproduced, performed, distributed or otherwise exploited by Sirius XM in the United States without a license or authorization to do so from August 1, 2009 through November 14, 2016." Case No. CV13-05693, Dkt. 676.

### C. *ABS Entertainment v. CBS Corporation*

Following Flo & Eddie's successful summary judgment motion on liability in September of 2014, a number of other actions were filed around the country against other unauthorized broadcasters of pre-1972 recordings, including the instant case filed by ABS against defendant CBS for publicly performing ABS's recordings through terrestrial radio broadcasts and digital internet streams.

CBS argued on summary judgment that it "only broadcast digitally re-mastered or re-issued [pre-1972] recordings which were created after February 15, 1972; and that [its] broadcast of such works is governed by federal copyright law rather than California state law." *ABS*, 2016 U.S. Dist. LEXIS 71470, at *8-9. Based on the record before it, the district court agreed, finding the remastering process that the pre-1972 recordings at issue were subjected to involved sufficient creativity so as to qualify for federal copyright protection as derivative works. *Id.* at *11-29, 31-33. The district court held that CBS's performance of the post-1972

14

derivative recordings was governed exclusively by federal copyright law. The court concluded that "CBS has the right to perform … on terrestrial radio without payment, and … through digital platforms under a statutory compulsory license." *Id.* at 36-37. The district court granted summary judgment in favor of CBS and dismissed ABS's action. *Id.* at *46-47.

## IV.   ARGUMENT

### A.   The District Court's Ruling Violates Section 301 of the Copyright Act and Misapplies the Settled Law of Derivative Works

The District Court erred in holding that if federal protection exists for the remastered elements of a pre-1972 recording, it *subsumes* the underlying state law protection when exploited by a broadcaster. The taking of the remastered sounds necessarily also takes the underlying original sounds first captured in the pre-1972 fixation, which a right to use the derivative work cannot absolve. *Stewart v. Abend*, 495 U.S. 207, 222-24 (1990) (holding that a licensed derivative work could not be reproduced or distributed absent rights to reproduce and distribute the portions of the pre-existing work that were incorporated into the derivative work).

As the district court acknowledged, it is black letter law that a derivative copyright extends only to the original and independent expression contained therein, and does not extend to or limit the separate copyright interests in the original sound recording embedded in the derivative work. Indeed, the district court recognized that "the original aspects of a derivative work … must not in any

15

way affect the scope of any copyright protection in that preexisting material." *ABS*, 2016 U.S. Dist. LEXIS 71470, at *14-15 (quoting *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012)). The court *agreed* that the plaintiffs "retain their common law rights in their pre- 1972 Sound Recordings embedded in the derivative works performed by CBS." *Id*. at *36. Yet the court concluded that those rights were not violated when CBS performed the post-1972 derivative recordings.

The court's conclusion is reversible error. Given that the sounds fixed in a pre-1972 recording remain embodied and (in the Supreme Court's parlance) "on grant" in the post-1972 remastered recording, *Abend*, 495 U.S. at 223, it follows that when the remastered recording is performed without authorization, the copyright of original sound recording is infringed. *See DC Comics v. Towle*, 802 F.3d 1012, 1023 (9th Cir. 2015). It is irrelevant that CBS has the right under federal law to perform post-1972 sound recordings. Plaintiffs' common law rights in their pre-1972 recordings remain intact, and CBS commits infringement when performing any post-1972 derivative works without a license. *See* Melville B. Miller and David Nimmer, Nimmer on Copyright § 3.05 (2015) ("[I]f the material copied was derived from a copyrighted underlying work, this will constitute an infringement of such work regardless of whether the defendant copied directly from the underlying work, or indirectly via the derivative work."). This is

16

not an unfamiliar concept in the world of copyright law. *See, e.g., Davis v. E.I. DuPont deNemours & Co.*, 240 F. Supp. 612 (S.D.N.Y. 1965) (defendants who obtained permission to use a screenplay but not the play upon which the screenplay was based committed copyright infringement).

The district court's contrary conclusion erroneously relies on a single unpublished district court decision that addresses *post*-1972 recordings and related derivative works. *See ABS*, 2016 U.S. Dist. LEXIS 71470, at *37 (citing *Pryor v. Jean*, 2014 U.S. Dist. LEXIS 143515, *12 (C.D. Cal. Oct. 8, 2014)). *Pryor* held that under 17 U.S.C. § 114(b), a licensee's use of the "actual sounds" of a remastered recording did not infringe the copyright of the underlying post-1972 recording because the "actual sounds" of the original recording were not used when the defendants duplicated, rearranged, or remixed the licensed derivative recording. By its own terms, however, 17 U.S.C. § 114 does not govern the *pre*-1972 recordings that are at issue in this case. That is, pre-1972 recordings are not subject to the federal limitation concerning use of "actual sounds" that *Pryor* relied upon when concluding that a licensee's use of a remastered sound recording did not infringe the original sound recording. *See* 17 U.S.C. § 301(c).

The *Pryor* Court did not engage in any analysis concerning state copyright law governing pre-1972 recordings or the copyright protection afforded to material embedded in a derivative work; nor did it suggest that a derivative copyright

17

abrogates the copyright protection of the original work. *Pryor*'s holding—whether right or wrong—is irrelevant to the case at hand.

A remastering recaptures the sounds embodied on the original recording. It is therefore a direct taking of those protected sounds, as is any subsequent use of the remastered recording. To limit that protection to a particular fixation is to forget that "a sound recording"—i.e., the sounds themselves—"must be distinguished from … the material object on which the sound is recorded." NIMMER ON COPYRIGHT § 2.10[A][2] (2015). Thus, CBS is ***not*** absolved of liability by performing a remastered recording, so long as it includes the same sounds (however modified during the remastering process) embodied in the original.

## B.    The District Court's Ruling Threatens to Cause Widespread Legal Uncertainty and Undermine the Rights of Artists

Prior to the district court's ruling, it was well-recognized that state law governed the copyright protection of a pre-1972 recording incorporated in a post-1972 remastering—even if the remastered version constituted a derivative post-1972 recording. A detailed factual analysis of the level of originality incorporated into the remastered recording was unnecessary to determine whether state or federal copyright protection applied, or whether performance of the remastered recording required authorization from the owner of the original recording. If affirmed and broadly interpreted and applied, the district court's ruling may result in this no longer being true.

18

Applying the factual analysis of the district court, it may be that nearly all post-1972 remastered recordings constitute derivative works, given that the use of sound engineers to make "equalization changes" guided by their "personal aesthetic" is commonplace. *Id.* at *16. Indeed, ordinary adjustments to "bass," "treble," "midrange," "highs," "lows," "echo," or "other frequencies on the equalizer to emphasize and deemphasize certain instruments and vocal sections[,]'" may now be all that is required for a brand new copyright to subsist. *ABS*, 2016 U.S. Dist. LEXIS 71470, at *15-16. Absent reaffirmation of the basic principle that the creation of a derivative work does not alter or undermine the pre-existing rights in the original underlying work, this could result in the evisceration of states' ability to provide copyright protection for pre-1972 recordings—an ability specifically called for by Congress.

Additionally, the district court's ruling inevitably will result in the manipulation of termination rights through the remastering process by allowing non-creator assignees to avoid termination by simply remastering a recording (and thereby receiving derivative copyright protection). The 1976 Copyright Act provides that, in the case of a copyright assigned from its original creator to a third party, that creator (or the heirs thereof) may recapture the assigned copyright after and within a set period of time. *See Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 984-85 (9th Cir. 2008). "The 1976 Act, and in particular its twin termination of

transfer provisions, were in large measure designed to assure that its new benefits would be for the authors and their heirs. […] More particularly, the termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product." *Id.*

This goal, however, is eviscerated if the remastering of a sound recording provides for a completely new copyright as a derivative work. The termination provisions of the Copyright Act contain a "derivative works exception" which can allow for the continued exploitation of a derivative work even after the reversion of the underlying work through a successful termination. *See Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173-74 (1985) ("Therefore, even if a person acquired the right to exploit an already prepared derivative work by means of an unfavorable bargain with an author, that right was to be excluded from the bundle of rights that would revert to the author when he exercised his termination right."). This could allow record labels to license and exploit remastered sound recordings notwithstanding termination of the original copyright grants, at which point the labels would compete directly with artists and/or their heirs in the marketplace for licensing and exploiting what are essentially the same works (except the labels' versions will remain protected longer by virtue of their later creation).

In short, the district court's ruling is a Pandora's box that seems poised to overrun the copyright landscape if left open. All of the abovementioned problems, however, can be mitigated by simply reversing the district court's erroneous application of the law concerning derivative works and ensuring that owners of pre-1972 recordings remain secure in their rights under state law, just as Congress intended.

## V. CONCLUSION

For the foregoing reasons, this Court should reverse the district court's erroneous ruling as to the effect of remastering on pre-1972 recordings, and hold that the pre-1972 recordings incorporated into a post-1972 remastered derivative work are protected by state copyright law.

Dated: February 23, 2017          Respectfully submitted,

By: /s/ Steven G. Sklaver

GRADSTEIN & MARZANO, P.C.
Henry Gradstein
Maryann R. Marzano
Daniel B. Lifschitz

SUSMAN GODFREY L.L.P.
Stephen E. Morrissey
Steven G. Sklaver
Kalpana Srinivasan

Attorneys for *Amicus Curiae*
FLO & EDDIE, INC.

21

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS PURSUANT TO FED. R. APP. P. 32(a)(7)(C)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify as follows:

1. This Brief of Amici Curiae Flo & Eddie, Inc. In Support of Plaintiff-Appellant complies with the type-volume limitation, because this brief contains 4,843 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii); and

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2011, the word processing system used to prepare the brief, in 14 point font in Times New Roman font.

Dated: February 23, 2017                    By: /s/ Steven G. Sklaver
                                                 Steven G. Sklaver

1

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on February 23, 2017.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: February 23, 2017                    By: /s/ Steven G. Sklaver
                                                       Steven G. Sklaver