No. 16-55917

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————————

ABS ENTERTAINMENT, INC. an Arkansas corporation;
BARNABY RECORDS, INC., a New York corporation;
BRUNSWICK RECORD CORPORATION, a New York corporation;
MALACO INC, a Mississippi corporation, each individually and on behalf of all others similarly situated,
*Plaintiffs-Appellants,*

v.

CBS CORPORATION, a Delaware corporation;
CBS RADIO INC., a Delaware corporation,
*Defendants - Appellees.*

————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
NO. 2:15-CV-06257-PA-AGR

The Honorable Percy Anderson, District Court Judge

————————————

## APPELLEES' ANSWERING BRIEF

————————————

ROBERT M. SCHWARTZ
VICTOR JIH
ANDREW J. STRABONE
AMIT Q. GRESSEL
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
(310) 277-1010

*Counsel for Defendants-Appellees*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee CBS

Corporation certifies that National Amusements, Inc., a privately held company,

beneficially owns the majority of the Class A voting stock of CBS Corporation.

Otherwise, with respect to ownership of the Class A voting stock of CBS

Corporation in the amount of 10% or more, CBS Corporation is only aware of the

following information based upon filings made pursuant to a Schedule 13(d) or

Section 13(g) of the Securities and Exchange Act of 1934: according to a Schedule

D dated February 25, 2011 and filed with the SEC on March 15, 2011, GAMCO

Investors, Inc., along with certain entities and persons affiliated therewith, hold

shares representing, as of December 31, 2014, approximately 11.6% of CBS

Corporation's Class A voting stock, and CBS Corporation is not aware of any

other publicly traded corporation that owns 10% or more of its stock.

Appellee CBS Radio Inc. certifies that CBS Corporation is the ultimate

parent corporation of CBS Radio Inc.

Dated:  May 8, 2017

IRELL & MANELLA LLP


By:     */s/ Robert M. Schwartz*
           Robert M. Schwartz
           Attorneys for Defendants-Appellees
           CBS Corporation and
           CBS Radio Inc.

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................... 1

JURISDICTIONAL STATEMENT ...................................... 3

STATEMENT OF THE ISSUES............................................ 3

STATEMENT OF THE CASE ............................................... 3

I.     FACTUAL BACKGROUND......................................... 3

       A.    Appellants Claim That They Own Pre-1972
             Sound Recordings ................................................ 3

       B.    Appellants Authorized the Creation and Public Release of
             Remastered Digital Versions of those Sound Recordings................. 4

       C.    CBS Publicly Performed the Remastered Sound Recordings ........... 8

II.    PROCEDURAL BACKGROUND................................. 9

       A.    Appellants File a Class Action Complaint Alleging Copyright
             Infringement Under State Law ......................................... 9

       B.    Appellants Fail to Comply with the Court's Rules and the
             Court Strikes the Class Allegations ................................. 10

       C.    CBS Successfully Moves for Summary Judgment........................... 12

SUMMARY OF ARGUMENT ............................................. 15

STANDARD OF REVIEW .................................................. 19

LEGAL DISCUSSION ........................................................ 20

I.     THE DISTRICT COURT CORRECTLY FOUND THAT THE
       REMASTERED RECORDINGS WERE FEDERALLY
       COPYRIGHTED DERIVATIVE WORKS ............................. 20

       A.    The District Court Applied the Correct Standard for
             Copyrightability of the Remastered Sound Recordings .................. 20

**Page**

    B.    Appellants Failed to Offer Admissible Evidence on the Copyrightability of the Remastered Recordings.............................. 25

    C.    Appellants Authorized the Remastered Recordings ........................ 29

II.    THE DISTRICT COURT CORRECTLY HELD THAT FEDERAL LAW GOVERNS FEDERALLY COPYRIGHTED WORKS .................. 35

    A.    Federal Law Governs Post-February 15, 1972 Sound Recordings ..................................................................... 35

    B.    State Law Cannot Be Used to Control the Use of Federally Copyrighted Works, Even if They Are Derived From or Incorporate Elements of Pre-1972 Sound Recordings ..................... 38

    C.    Appellants' Invocation of State Law Frustrates Federal Law and Defeats the Limitations and Exclusions Congress Enacted for Sound Recording Copyright Protection ........................ 43

    D.    Appellants' Arguments For The Application of State Law Fail ................................................................................ 46

        1.    The Ruling Below Does Not Conflict With Section 301 .............................................................................. 46

        2.    The Ruling Does Not Conflict With Section 103(b) ............. 48

        3.    The Ruling Does Not Conflict With *Stewart v. Abend*.......... 49

III.    THE DISTRICT COURT PROPERLY EXCLUDED PLAINTIFFS' INADMISSIBLE EVIDENCE........................................... 51

IV.    THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION TO STRIKE APPELLANTS' CLASS CLAIMS .............. 54

CONCLUSION .................................................................................. 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bonneville Int'l Corp. v. Peters*,
  347 F.3d 485 (3d Cir. 2003) ................................................................51

*Buckland v. Maxim Healthcare Servs., Inc.*,
  2012 WL 3705263 (C.D. Cal. Aug. 27, 2012) ..................................58

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
  262 F. Supp. 2d 204 (S.D.N.Y. 2003) ...............................................50

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
  4 N.Y.3d 540 (2005) ...............................................................23, 24

*Capitol Records, LLC v. Vimeo, LLC*,
  826 F.3d 78 (2d Cir. 2016) .................................................................45

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................27

*Equals Three, LLC v. Jukin Media, Inc.*,
  139 F. Supp. 3d (C.D. Cal. Oct. 13, 2015) .......................................54

*Fahmy v. Jay-Z*,
  2015 WL 3407908 (C.D. Cal. May 27, 2015)....................................33

*Falcon Enterprises, Inc. v. Publishers Serv., Inc.*,
  438 F. App'x 579 (9th Cir. 2011) ................................................19, 54

*Fazio v. City and County of San Francisco*,
  125 F.3d 1328 (9th Cir. 1997) ...........................................................27

*Fleet v. CBS, Inc.*,
  50 Cal. App. 4th 1911 (1996) .......................................................42, 43

*Flo & Eddie, Inc. v. Pandora Media, Inc.*,
  2017 WL 992513 (9th Cir. Mar. 15, 2017) ........................................10

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
  849 F.3d 14 (2d. Cir. 2017) ...............................................................10

**Page(s)**

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) ....................................................22

*Gilliam v. ABC*,
538 F.2d 14 (2d Cir. 1976) .......................................................51

*Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.*,
803 F.2d 250 (6th Cir. 1986) ...................................................34

*Gracen v. Bradford Exchange*,
698 F.2d 300 (7th Cir. 1983) ...................................................21

*Hanlon v. Chrysler Corp.*,
150 F.3d 1011 (9th Cir. 1998) .................................................57

*Harman v. Apfel*,
211 F.3d 1172 (9th Cir. 2000) .................................................20

*Hollingsworth v. Perry*,
558 U.S. 183 (2010)................................................................56

*James v. Delilah Films, Inc.*,
544 N.Y.S.2d 447 (Sup. Ct. 1989)..........................................39

*Kandel v. Brother Int'l Corp.*,
264 F.R.D. 630 (C.D. Cal. 2010)..............................................57

*KNB Enterprises v. Matthews*,
78 Cal. App. 4th 362 (2000) ....................................................43

*L.A. Printex Indus., Inc. v. Aeropostale*,
2010 WL 2813800 (C.D. Cal. May 5, 2010)............................33

*Lance, Inc. v. Dewco Servs., Inc.*,
422 F.2d 778 (9th Cir. 1970) ...................................................56

*Laws v. Sony Music Entm't, Inc.*,
448 F.3d 1134 (9th Cir. 2006) .................................................41

**Page(s)**

*Mahavisno v. Compendia Bioscience, Inc.*,
2015 WL 248798 (E.D. Mich. Jan 20, 2015) ....................................................32

*Maljack Prods., Inc. v. UAV Corp.*,
964 F. Supp. 1416 (C.D. Cal. 1997) ...................................................................23

*Maloney v. T3Media, Inc.*,
2017 WL 1244899 (9th Cir. Apr 5, 2017)....................................................41, 42

*McIntosh v. Maricopa County Community College Dist.*,
456 Fed. App'x. 637 (9th Cir. 2011) ..................................................................19

*Montz v. Pilgrim Films & Television, Inc.*,
649 F.3d 975 (9th Cir. 2011) .......................................................................40, 49

*Motty v. First Student, Inc.*,
2016 WL 4498452 (C.D. Cal. Aug. 26, 2016) ..................................................56

*Munchoff v. Munchoff*,
2015 WL 5167625 (C.D. Cal. Sep. 3, 2015) .....................................................57

*Nadel v. Play-by-Play Toys & Novelties, Inc.*,
208 F.3d 368 (2d Cir. 2000) ..............................................................................40

*New York Times Co. v. Tasini*,
533 U.S. 483 (2001)...........................................................................................23

*NLRB v. First Termite Control Co.*,
646 F.2d 424 (9th Cir. 1981) .............................................................................53

*Oliva v. Sullivan*,
958 F.2d 272 (9th Cir. 1992) .............................................................................56

*Perez v. Safelite Group Inc.*,
2014 U.S. App. LEXIS 4353 (9th Cir. Mar. 7, 2014) .......................................58

*Pincay v. Andrews*,
389 F.3d 853 (9th Cir. 2004) .............................................................................57

**Page(s)**

*Pryor v. Jean*,
   2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014) ..................................23

*Schrock v. Learning Curve Int'l, Inc.*,
   586 F.3d 513 (7th Cir. 2009) ......................................................................21, 32

*Shoptalk, Ltd. v. Concorde-New Horizons Corp.*,
   168 F.3d 586 (2d Cir. 1999) .......................................................................39, 40

*Spann v. J.C. Penny Corp.*,
   2013 WL 11332969 (C.D. Cal. July 15, 2013)..................................................56

*Spear Mktg., Inc. v. BancorpSouth Bank*,
   791 F.3d 586 (5th Cir. 2015) ............................................................................40

*Stewart v. Abend*,
   495 U.S. 207 (1990)....................................................................................49, 50

*Tongil Co. v. Vessel Hyundai Innovator*,
   968 F.2d 999 (9th Cir. 1992) .............................................................................53

*Tucker v. Colorado Dept. of Public Health and Environment*,
   104 Fed. App'x. 704 (10th Cir. 2004) ...............................................................56

*Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*,
   515 F.3d 1019 (9th Cir. 2008) ...........................................................................28

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
   692 F.3d 1009 (9th Cir. 2012) ...........................................................................20

*U.S. v. Carlson*,
   900 F.2d 1346 (9th Cir. 1990) ...........................................................................26

*U.S. v. Taxe*,
   380 F. Supp. 1010 (C.D. Cal. 1974) ............................................................24, 50

*United States v. Ray*,
   920 F.2d 562 (9th Cir. 1990) .............................................................................52

**Page(s)**

*Watson v. Schwarzenegger,*
  347 F. App'x 282 (9th Cir. 2009) ....................................................57

*Wolin v. Jaguar Land Rover North America LLC,*
  617 F.3d 1168 (9th Cir. 2010) ......................................................19

**Rules**

Fed. R. Civ. Proc. 23 ....................................................................57

Fed. R. Civ. Proc. 83(b) ...............................................................56

Fed. R. Evid. 803(6) .....................................................................51

Fed. R. Evid. 1006 .......................................................................34

Local Rule 4 ................................................................................10

Local Rule 7-3 ...............................................................11, 12, 54

Local Rule 23-3 ...........................................................10, 54, 55

**Statutes**

17 U.S.C. § 102(b) .......................................................................49

17 U.S.C. § 103(b) ..................................................................48, 49

17 U.S.C. § 106 ...........................................................................36

17 U.S.C. § 111 ...........................................................................46

17 U.S.C. § 112 .............................................................................9

17 U.S.C. § 114 ....................................................................*passim*

17 U.S.C. § 115 .....................................................................36, 37

17 U.S.C. § 301 ....................................................................*passim*

17 U.S.C. § 512 ...........................................................................45

**Page(s)**

Cal. Civ. Code § 980 ...................................................................35

Digital Performance Right in Sound Recordings Act.............................37

Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391
    (1971)..................................................................................35

**Other Authorities**

141 Cong. Rec. S945-02, 1995 WL 15600 (statement of Sen. Hatch)....................38

H.R. Rep. 94-1476 ....................................................................47

H.R. Rep. 104-274 ...............................................................36, 37

Nimmer on Copyright ...........................................................23, 32

S. Rep. 104-128.........................................................................36

Staff of H. Comm on the Judiciary, 95th Cong., *Performance Rights
    in Sound Recordings* 824 (Comm. Print. 1978)..................................36

## **INTRODUCTION**

The district court's decision adheres to a basic axiom of copyright law: federal law governs federally copyrighted works. The district court reviewed the undisputed evidence and determined that the sound recordings at issue in this case were derivative works, subject to federal copyright, and thus beyond the reach of state law. Although the derivative works were based on recordings made before 1972, which are subject to state law, the district court reached its conclusion based on two undisputed facts: (1) Appellants had authorized the remastering of their sound recordings; and (2) the remastered versions, made long after 1972, contained sufficient, original expression to qualify as federally protected derivative works.

CBS was entitled to summary judgment because, under federal law, CBS has the right to perform post-1972 sound recordings on terrestrial radio without payment and to perform them digitally pursuant to a statutory compulsory license.

In seeking to reverse that judgment, Appellants claim that state law should apply to federally copyrighted works that are "derived" from pre-1972 sound recordings. Appellants and *amici* make no secret that they seek to apply state law to defeat the public performance limitations and compulsory license granted under federal copyright law. Their position directly contradicts the bright line Congress established in Section 301(c), which applies federal law to any sound recording fixed after February 15, 1972, and contradicts Congress's intention to end

competing copyright regimes. Appellants' approach would not be limited to remastered sound recordings. It would extend to any sound recording containing any piece of a pre-1972 sound recording. This Frankenstein application of state law to some parts of a work but federal law to other parts finds no support in any statute, legislative history, or case law, and would create an unworkable system.

Appellants contend that the district court's decision threatens the loss of state law rights in their pre-1972 sound recordings. It does no such thing. Appellants' rights in these pre-1972 sound recordings are untouched. They can distribute, copy, license for remastering, or otherwise exploit the recordings however they like. What they cannot do is authorize the unfettered creation of a derivative work today and then use their state law rights in the pre-1972 version to restrict the use of the new work. The district court correctly held that state law cannot be invoked to frustrate federal law in that way.

The district court's other holdings were also correct. It did not abuse its discretion in excluding Appellants' hearsay evidence, when Appellants provided no foundation for any business record exception or its reliability. And it did not abuse its discretion in striking Appellants' class action allegations for repeatedly disregarding its local rules and standing order. This Court should affirm the district court's decision.

## JURISDICTIONAL STATEMENT

Appellees CBS Corporation and CBS Radio Inc. (together, "CBS") agree with Appellants' Jurisdictional Statement.

## STATEMENT OF THE ISSUES

1.      Did the district court err in finding that the remastered sound recordings were federally copyrighted derivative works?

2.      Does state law apply to federally copyrighted sound recordings that are derived from or incorporate elements of pre-1972 sound recordings?

3.      Did the district court err in excluding plaintiffs' hearsay evidence?

4.      Did the district court abuse its discretion in striking the class allegations in response to Appellants' violations of the Central District of California's local rules and the district court judge's standing order?

## STATEMENT OF THE CASE

## I.      FACTUAL BACKGROUND

### A.      Appellants Claim That They Own Pre-1972 Sound Recordings

There are four Appellants.  ABS Entertainment, Inc. ("ABS") claims to be the owner of sound recordings by Al Green, Willie Mitchell, Ace Cannon, and Otis Clay.  Barnaby Records, Inc. ("Barnaby") claims to be the owner of sound recordings by Andy Williams, Johnny Tillotson, The Everly Brothers, Lenny Welch, Ray Stevens, and The Chordettes.  Brunswick Record Corporation

("Brunswick") claims to be the owner of sound recordings by Jackie Wilson, The Chi-Lites, The Lost Generation, the Young-Holt Unlimited, and Tyrone Davis. Malaco, Inc. ("Malaco") claims to be the owner of sound recordings by King Floyd, Mahalia Jackson, and The Cellos.

In the operative pleading, the First Amended Complaint, Appellants listed 174 sound recordings that they claim to own. ER 2922-32. Each was originally fixed before February 15, 1972.

When these sound recordings were created, they consisted of individual tracks of the recording artists' performances that were fixed on magnetic tape. ER 1290-94. These tracks were then edited and consolidated into a single track (for mono) or two tracks (for stereo). That version was called the "master recording." *Id*. Record companies created copies of these "masters" and sent them to replicating facilities, which transferred the recording to the physical format chosen for commercial distribution. *Id*. Before 1972, recordings were sold mostly in the form of vinyl records. *Id*. Cassette and 8-track tapes supplemented vinyl records. Starting in 1982, compact discs (CDs) took over. *Id*.

### B. <u>Appellants Authorized the Creation and Public Release of Remastered Digital Versions of those Sound Recordings</u>

CDs proved to be a turning point for sound recordings. The sound quality and dynamic range of a vinyl record is limited by the laws of physics to what can be stored on and then coherently reproduced from the tiny groove cut into the vinyl

disc. CDs do not have that limitation and are nearly unlimited in the sound range that they can reproduce. ER 1294. To keep up with changes in music technology, record companies began "remastering" their older sound recordings and selling them to the public as new and improved versions. ER 1290-94.

"Remastering" a sound recording requires a skilled sound engineer to equalize, balance, and compress/decompress the recording to capture the best elements of the artists' performances and to take full advantage of modern sound reproduction technology. *Id.* Engineers envision a particular sound or feeling they want to create, work from the original masters, and create a new master—a process that entails a great deal of time, energy, and creativity. *Id.* For example, a sound engineer may listen to an original recording and determine that, for today's listeners, a recording that emphasizes the vocals will sound more pleasing. ER 1294. To create this change, the engineer may re-equalize the recording by reducing its low range frequencies and raising its midrange frequencies. *Id.* Similarly, if a record company wants to release a remastered album targeting audiophiles and collectors with high-end systems, the engineer may choose to emphasize lower frequencies. *Id.* Each of these decisions requires the sound engineer to listen, identify, and adjust many discrete settings. Great sound engineers are celebrated and hired across the industry to remaster older recordings.

Record companies, including Appellants, have profited from skillfully remastered recordings. Consumers appreciate the improved sound quality and more convenient format. "To repeat buyers of Johnny Cash, The Beatles, Miles Davis, The Beach Boys, Glenn Gould, and many other iconic artists, 'remastered' signals that the original music has undergone a restoration process to upgrade the sound." Marc Myers, *Behind the Remastering Boom*, THE WALL STREET JOURNAL, Dec. 14, 2012, http://www.wsj.com/articles/SB1000142412 788732402400457817 1390737319744. Conversely, a poor remastering job can elicit strong opinions:

> The mastering engineer here definitely used too many of the tools at his disposal in an effort to enhance what was already on the master tapes. Unfortunately removing the analog tape hiss (not that it was excessive to begin with anyway) removed the sense of life from these recordings. And other processing REALLY screwed up some of these songs, causing the vocals to become an unfocused mess (I've heard that this is the result of an attempt to widen the stereo image). Do yourself a favor and seek out the previous CD on the same label (unfortunately no bonus tracks there) or an import version on the Demon label.

ER 1221 ("5 star album, 1 star mastering job," http://www.amazon.com/Im-Still-Love-With-You/dp/B000087DSN (last accessed April 20, 2017)).

To take advantage of the CD format, which did not emerge until more than ten years after 1972, Appellants authorized the creation and release of remastered versions of their sound recordings. For example, public searches show that 85 versions of Al Green singing *Tired of Being Alone*, which ABS alleges to own, have been re-released since 1972. *See Tired of Being Alone* http://www.allmusic

.com/song/tired-of-beingalone-mt0033488774, (last accessed April 20, 2017).

Similarly, 158 versions of the Everly Brothers singing *Bye Bye Love,* which Barnaby claims to own, have been re-released since 1972.  *See The Everly Brothers: Bye Bye Love*, http://www.allmusic.com/song/bye-bye-lovemt 0011984624, (last accessed April 20, 2017).  There have been at least 56 versions of Tyrone Davis signing *Can I Change My Mind*, which Brunswick claims to own, re-released since 1972.  *See Tyrone Davis: Can I Change My Mind*, http://www .allmusic.com/song/can-i-changemy-mind-mt0006432728, (last accessed April 20, 2017).  And *His Eye Is On the Sparrow* by Mahalia Jackson, which Malaco claims to own, has been re-released at least 32 times since 1972.  *See Mahalia Jackson: His Eye Is on the Sparrow*, http://www.allmusic.com/song/ his-eye-is-on-the-sparrow-mt0000149160 (last accessed April 20, 2017).

Each Appellant confirmed that it authorized the creation and release of these remastered recordings.  ER 143:14-17, 149:23-150:14 (ABS), 166:9-12, 167:7-21 (Barnaby), 197:18-198:1 (Brunswick), 221:2-11 (Malaco).  Appellants knew that, as part of the remastering, the sound recordings would be re-equalized (ER 152:25-153:8; 197:22-198:1, 198:15-17), optimized for digital formats (ER 167:7-21), compressed as necessary (ER 199:24-200:2), and that the loudness properties

would be adjusted (ER 200:5-8).[1]  Appellants had the opportunity to review and approve each of the remastered recordings before its release.  ER 150:18-151:2. Appellants confirmed that they are unaware of a single remastered sound recording at issue that they did not approve or authorize.  ER 166:9-12.  And they continue to collect royalties from the exploitation of these remastered recordings.  ER 141:8-10; 167:19-21; 196:18-20; 238:21-24.

### C.  CBS Publicly Performed the Remastered Sound Recordings

CBS delivers music through broadcast radio channels, the Internet, and mobile applications.  CBS owns and operates 117 terrestrial radio stations in 26 U.S. media markets, including 18 music formatted stations in California; CBS digitally streams the broadcasts of those stations over the internet.  ER 2419.  In addition, CBS operates Radio.com, a digital streaming service available online and via mobile applications.  ER 1926.

Significantly, CBS did not play Appellants' pre-1972 sound recordings. CBS uses computerized systems into which it placed a digital file of each sound recording it performed.  ER 1926 at 13-17, ER 2425 at 1-14.  These systems

---

[1] "Loudness" is a distinct concept from "volume."  The latter is controlled by the user with a volume knob.  The process of remastering a track to boost the "loudness" is complex, and takes creativity to avoid sacrificing the song's clarity, artistic attributes, and affect.  *See* ER 1294-99 (Inglot Declaration).  For example, the juxtaposition of quiet parts of a song against the louder parts can add subtlety and better convey the artistic intent.  ER 1297.  And as Mr. Inglot explained, "the process of raising or lowering the loudness of a track can be complex."  *Id.*

necessarily play digital, not analog (vinyl) files. *Id.* The digital sound recordings came either from CDs (that CBS lawfully acquired) or from digital transmissions from the record owner. ER 1926 at 13-18, 24-28; ER 2425 at 1-14. If any documents suggest that CBS publicly performed a particular song whose recording Appellants claim to own, CBS performed a digital recording of that song.

Each time CBS played a recording—remastered or not—CBS paid a royalty to the owner of the underlying musical composition, which was usually collected by a performing rights organization such as ASCAP, BMI, or SESAC. ER 1797-98. For digital broadcasts, CBS also pays a per-stream license fee for the public performance, set by the Copyright Royalty Board, pursuant to a statutory license under U.S.C. Sections 112 and 114. *Id.* CBS pays this fee to SoundExchange, a digital rights management organization. *Id.* CBS is fully compliant with SoundExchange's licensing procedures. *Id.*

## II.  PROCEDURAL BACKGROUND

### A.  Appellants File a Class Action Complaint Alleging Copyright Infringement Under State Law

On August 17, 2015, ABS filed a putative class action complaint for copyright infringement against CBS Corporation and CBS Radio Inc. On October 29, 2015, ABS amended the complaint to add Barnaby, Brunswick, and Malaco. ER 2902-32. The complaint claimed copyright infringement on allegations that

CBS violated a state-law right of public performance in Appellants' sound recordings, all of which were fixed before February 15, 1972. *Id.*[2]

### B. Appellants Fail to Comply with the Court's Rules and the Court Strikes the Class Allegations

Under the Central District of California's Local Rule 23-3, parties who file a pleading purporting to commence a class action must file a motion for class certification within 90 days of service of the complaint. Appellants served their complaint on August 21, 2015, and thus had until November 19, 2015 to file a motion for class certification. ER 2949, Dkt. No. 18.

If a party needs additional time to meet a deadline, Judge Anderson's Local Rule 4 states that "requests for continuance should be submitted well in advance of the requested relief," (*see* "*Honorable Percy Anderson,*" https:// www.cacd. uscourts.gov/honorable-percy-anderson) and section 10(b) of Judge Anderson's Standing Order, issued at the start of the case, requires that applications or

---

[2] Appellants' claim assumes that there exists under California law a performance right for pre-1972 sound recordings. CBS disputes that there is. But that is not at issue: the district court directed the parties to leave that issue aside, and focus on only whether the post-1972 remastered recordings were derivative works subject to federal copyright. As to whether there is a performance right, the Ninth Circuit recently certified that question to the California Supreme Court. *Flo & Eddie, Inc. v. Pandora Media, Inc.*, No. 15-155287, 2017 WL 992513, at *1 (9th Cir. Mar. 15, 2017). If, as CBS believes, there is no right, that would provide an independent basis to affirm the judgment. *See Flo & Eddie, Inc. v. Sirius XM Radio, Inc.,* 849 F.3d 14, 16-17 (2d. Cir. 2017) (dismissing state law claims in light of state court decision that no right of public performance existed in pre-1972 recordings).

stipulations to extend time include "specific, concrete reasons supporting good cause for granting the extension." ER 2939-40, ¶10.

On November 16, 2015, just three days before the class motion deadline, Appellants filed a stipulation to extend the deadline but omitted a discussion of good cause. The district court denied the stipulation because there was "no showing of cause, let alone good cause." ER 2897. On November 17, 2015, Appellants filed another stipulation. Again it was denied because Appellants had failed to show good cause. ER 2886-91.

Two days later, Appellants filed a motion for class certification. However, Appellants again failed to comply with the Central District's rules and the district court's Standing Order. Local Rule 7-3 states that "counsel contemplating the filing of any motion shall first contact opposing counsel to discuss thoroughly, ***preferably in person***, the substance of the contemplated motion and any potential resolution." (emphasis added). The rule further states that "[i]f the parties are unable to reach a resolution which eliminates the necessity for a hearing, counsel for the moving party shall include in the notice of motion a statement" that the Rule 7-3 conference took place and the date thereof.

The district court's Standing Order reiterates this requirement. Section 6(a) requires counsel to "engage in a pre-filing conference 'to discuss thoroughly the contemplated motion and any potential resolution'" and to do so "sufficiently so

that … the briefing may be directed to those substantive issues requiring resolution by the Court." ER 2936, n.1. It also states that "no motion shall be noticed for hearing for more than thirty-five (35) days after service of the motion." *Id*. at ¶ 6.

Appellants noticed their motion for class certification for a February 22, 2016 hearing—95 days after service of the motion and 60 days beyond what the Standing Order permitted. ER 2808-10. Appellants did not include a statement pursuant to Local Rule 7-3 that the parties had met and conferred before filing the motion. ER 2808-10. In fact, Appellants never requested such a conference and none occurred. As a result, the district court struck Appellants' class certification motion and, because the deadline had passed for Appellants to file that motion, the court struck the complaint's class allegations. ER 2806-07.

## C.   CBS Successfully Moves for Summary Judgment

On February 19, 2016, CBS moved for summary judgment against the named plaintiffs on the basis that the only sound recordings CBS performed were post-1972, remastered recordings, which are governed exclusively by federal law. ER 2612-35. CBS provided both expert and percipient testimony showing that the sound recordings CBS had broadcast were remastered derivative works. ER 1289-1419 (Begault); ER 1420-1795 (Inglot); ER 1796-1924 (Benson); ER 1925-2417 (Neiman); ER 2418-2611 (Sottolano).

For example, one of CBS's experts, Dr. Begault, scientifically compared Appellants' version of each sound recording at issue to CBS's, using four objective criteria: (1) timbre, (2) spatial imagery, (3) sound balance, and (4) loudness range. ER 1429-43. He presented his results in narrative (ER 1443-98) and detailed graphic form. ER 1504-1782. He concluded that ***none*** of Appellants' recordings matched CBS's. ER at 1424-25.

CBS also provided the testimony of Appellants' own representatives that Appellants had authorized the creation of these works. ER 143:8-13, 150:18-24 (ABS); 166:9-167:18 (Barnaby); 197:18-198:1, 201:12-22 (Brunswick); 218:12-18, 220:1-4 (Malaco). CBS noted that Appellants lacked admissible evidence that CBS had played the sound recordings they claimed to own, as opposed to another recording with the same title. ER 101, 112-114.

In opposition, Appellants submitted an expert declaration from Paul Geluso, who studied the first five seconds of both the original and the remastered recordings and concluded that the remastered recordings were "derived" from and "embodied" the pre-1972 recordings. ER 284-567. Although Appellants acknowledged that they had authorized the creation of the remastered recordings, they argued that they did not authorize the creation of new derivative works that would be subject to federal copyright. ER 1027 at 21-27, 1047 at 12-27. To make that claim, Appellants submitted declarations from their representatives. ER 1141-

45 (Brunswick); ER 1150-54 (ABS); ER 1159-63 (Malaco); ER 1168-72 (Barnaby). And to prove which versions CBS performed, Appellants submitted reports derived from the records of a third party (Triton), but created by Appellants' counsel. ER 713-890.

The district court sustained CBS's objections to all of that evidence. It excluded Mr. Geluso's declaration because, among other things, he analyzed only the first five seconds of each recording and failed to disclose that the results from his first test method showed audible differences between Appellants' pre-1972 recordings and those that CBS had aired. ER 12. The court excluded Appellants' evidence that they did not authorize the creation of derivative works because, at deposition, their representatives admitted a lack of personal knowledge of their own declarations, and because they failed to offer any of the licenses into evidence. ER 16. The court sustained CBS's objection to the lawyer-created summary of the third-party reports because Appellants had failed to establish the foundation necessary for the business records exception to the hearsay rule and noted that, even if they were not hearsay, they would be unhelpful. ER 19.

Based on the undisputed evidence properly before it, the district court found that: (1) CBS performed recordings that were post-1972 recordings containing federally copyrightable original expression added during remastering, or (2) CBS performed recordings that contained an entirely different performance of the

underlying musical composition than Appellants' pre-1972 version, or

(3) Appellants' only evidence that CBS performed those works was inadmissible, and, "even if it were admissible, is insufficient to create a genuine dispute of material fact." ER 20. Because the post-1972 recordings contained federally copyrightable original expression, the district court held that they are governed by federal copyright law alone and not subject to any state law. ER 3, 14.

## SUMMARY OF ARGUMENT

The district court properly granted summary judgment for CBS.

1.     The district court correctly held that the remastered sound recordings at issue were federally copyrighted derivative works. To determine whether a work is a derivative work, a court must look at the originality of the new work. The originality must be non-trivial and must be distinguishable from the underlying work. The district court correctly applied that standard to find that the remastered sound recordings were derivative works and federally copyrightable.

The undisputed evidence established that the remastered recordings contain non-trivial and distinguishable originality. Appellants do not contest that there are audible differences between the remastered sound recordings that CBS performed and the pre-1972 recordings that Appellants claim to own. Appellants' own expert conceded as much. Instead, Appellants suggest that remastering done using a computer can *never* rise to the level of originality sufficient to create a derivative

work.  Putting aside their oversimplified view of the remastering process, that is not the law.  Even their own *amici* acknowledge that remastering can create a derivative work.  There is no categorical disqualification of computer-based remastering from copyrightability.  Rather, it depends entirely on what is actually done to remaster a particular recording.

Appellants have no basis to now contest the district court's finding on copyrightability: they chose to offer no evidence as to any differences between the works at issue.  Appellants chose to test only the first five seconds of each recording and, then, only did so for the purpose of determining whether the remastered sound recordings "embody" the underlying works.  In other words, Appellants sought to prove only that the remastered works are in fact derivative of the original pre-1972 sound recordings.  But no one disputed that.  Appellants chose not to contest the factual question whether the derivative works contain sufficient originality to be copyrightable.  There is no evidence in the record for them to argue otherwise now.

2.    The district court correctly held that, once the creation of a federally copyrighted derivative work is authorized, federal law applies to that work.

In support of its decision, the district court found that Appellants authorized the creation of the remastered recordings.  Appellants' representatives confirmed at their depositions that they consented to the creation of those remastered recordings.

These witnesses conceded that they understood that the remastering process would change the sound recordings in a number of ways. And they further conceded that they have no qualms with the remastered sound recordings remaining in the marketplace. Indeed, Appellants continue to receive money from their sale. In sum, Appellants do not dispute the *fact* of authorization. They dispute only the *legal* characterization of the remastered recordings as derivative works.

However, once the owner of a work has authorized its inclusion in a federally copyrighted work, federal copyright law—and only federal copyright law—applies to that work. State law cannot be used to prohibit the use of a federal work, regardless of whether that work is an original work or a derivative work. Such a system would create chaos and confusion as to which works were governed, and to what extent, by which copyright regime—exactly what Congress sought to avoid when it enacted Section 301 and eliminated the dual federal/state system of copyright. Sound recordings fixed after February 15, 1972, even if they incorporate elements of pre-1972 recordings, are governed by federal law.

Applying state law to federally copyrighted sound recordings, as Appellants seek, would frustrate the careful balance Congress drew between the rightsholders, broadcasters, and the listening public. To make it simple and cost-efficient for broadcasters to continue playing music to the public, without fear of unexpected liability, Congress carved out terrestrial radio broadcasters from any public

performance right and allowed digital broadcasters to perform the music pursuant to a compulsory license. Appellants' attempt to overlay state law would require broadcasters to individually negotiate for every sound recording they wished to perform that included any part of a pre-1972 sound recording. Such an expensive and time-consuming process cannot be squared with Congress's intention in creating the terrestrial exclusion and the compulsory license.

3.      The district court properly exercised its discretion to strike Appellants' hearsay evidence purporting to concern which sound recordings CBS played in California. Appellants acknowledge that the playlists prepared by third-party vendor Triton constitute hearsay, but argue that such evidence falls within the business records exception. Appellants never established, however, any foundation for the records; there is no evidence as to who prepared the Triton reports, how they were created, or how they are maintained.

4.      The district court also properly exercised its discretion to strike Appellants' class allegations. Appellants repeatedly violated the Central District of California's local rules and Judge Anderson's Standing Order. Appellants failed to take seriously the court's deadline for filing a motion for class certification, filed a last-minute motion without meeting and conferring, filed it without the required certification (because no meet and confer had occurred), and ignored the Standing Order's limitations on the hearing date. Appellants have offered no explanation for

why these violations happened. The Opening Brief attempts to trivialize them. It falsely suggests that Appellants had complied with the meet-and-confer requirement and that the only issue was the missing certification. The district court did not abuse its discretion in refusing to proceed with a putative class action on behalf of counsel and parties that had serially disregarded its rules.

## STANDARD OF REVIEW

The district court's summary judgment ruling is reviewed *de novo* while evidentiary rulings made in the course of ruling on the summary judgment motion are reviewed for abuse of discretion. *See Falcon Enterprises, Inc. v. Publishers Serv., Inc.*, 438 F. App'x 579, 581 (9th Cir. 2011). Review of a district court's application of its own rules is also reviewed for abuse of discretion. *See McIntosh v. Maricopa County Community College Dist.*, 456 Fed. App'x. 637, 638 (9th Cir. 2011).[3] "Normally, the decision of a trial court is reversed under the abuse of discretion standard only when the appellate court is convinced firmly that the

---

[3] Appellants cite *Wolin v. Jaguar Land Rover North America LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010) to suggest that an order denying class certification should be given less deference than one granting class certification. Opening Brief at 18. But *Wolin* is inapplicable because the district court here neither granted nor denied class certification. Rather, the court struck Appellants' motion for class certification and class allegations due to Appellants' failure to comply with the Central District's Local rules and the district court's Standing Order. ER 2806-07.

reviewed decision lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000).

## LEGAL DISCUSSION

## I.   THE DISTRICT COURT CORRECTLY FOUND THAT THE REMASTERED RECORDINGS WERE FEDERALLY COPYRIGHTED DERIVATIVE WORKS

### A.   The District Court Applied the Correct Standard for Copyrightability of the Remastered Sound Recordings

In granting summary judgment, the district court correctly applied the standard in *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009 (9th Cir. 2012), for the protection of a derivative work, which requires only that "the original aspects of a derivative work must be more than trivial" and "must not in any way affect the scope of any copyright protection in th[e] preexisting material." *Id.* at 1016; ER 8.  The court looked to "bedrock principles of copyright law" and found that derivative works need only meet a "minimal" level of creativity to qualify for copyright protection because "the requisite originality does not increase when a new copyrightable work is derivative of a pre-existing work." *Id.*[4]

Contrary to Appellants and their supporting *amici*, there is no special test for derivative works that requires a heightened showing of "substantial differences"

---

[4] The district court did not, as the CSEL amicus brief claims, apply a new standard requiring there to be "some perceptible changes."  Rather, the district court applied what CSEL concedes is the correct test by examining whether there is "sufficient nontrivial expressive variation."  CSEL Amicus at 7; ER 8-9,14.

from the original work.  Opening Brief at 15, 37, 41, 45.  The phrase "substantial

differences" originated in the Seventh Circuit's decision in *Gracen v. Bradford*

*Exchange*, 698 F.2d 300, 305 (7th Cir. 1983).  That Circuit has since clarified that

the "substantial differences" language should not be misapplied in the way

Appellants urge:

> [An] aspect of *Gracen* [] is prone to misapplication.  *Gracen* said that
> "a derivative work must be substantially different from the
> underlying work to be copyrightable."  This statement ***should not*** be
> understood to require a heightened standard of originality for
> copyright in a derivative work.

*Schrock v. Learning Curve Int'l, Inc.*, 586 F.3d 513, 516 (7th Cir. 2009) (emphasis

added).  The Seventh Circuit confirmed "the only 'originality' required for [a] new

work to be copyrightable is … enough expressive variation" from pre-existing

works "to enable the new work to be readily distinguished."  *Id.*  It concluded, "for

derivative works, as for any other work, the test of originality is concededly one

with a low threshold."  *Id.* at 521.  All that is needed is that "the author contributed

something more than a merely trivial variation."  *Id.*  This is the same test

articulated by this Circuit in *US Auto Parts* and the one the district court used.

Given this standard, the district court correctly held that remastered

recordings with sufficient originality can qualify as federally copyrighted

derivative works.  ER 14.  This is consistent with the view of the U.S. Copyright

Office, which confirms that remastered and reissued pre-1972 recordings can be

recognized as separate, derivative works as long as the editing process is not merely mechanical and involves "multiple kinds of creative authorship, such as adjustments of equalization, sound editing and channel assignment." ER 1228-29.[5]

Appellants advance a contrary view. But their view is not the law. They argue that "computer processing to optimize the existing sounds to be heard when migrating from one medium (analog) to another (digital) are outside the category of original, creative changes to a sound recording that would qualify as a derivative work." Opening Brief at 15. There is no such categorical exclusion.

Appellants harp on the fact that remastering involves the use of a computer. But copyrightability is tool-agnostic. A song composed on a guitar is just as copyrightable as one created using Apple's GarageBand software. Appellants also try to disqualify remastering by denigrating the purpose of migrating a work from one medium to another. Even though that is not an accurate characterization of what was done in remastering the works at issue in this case, copyrightability is also purpose-agnostic. Courts have found derivative works to be copyrightable even when the purpose was to migrate expression from one format to another. *See,*

---

[5] This Court often credits the expert opinion of the Copyright Office since it is the "office charged with administration and enforcement of the copyright laws and registration" and its positions reflect a "body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Garcia v. Google, Inc.*, 786 F.3d 733, 741-42 (9th Cir. 2015).

*e.g., New York Times Co. v. Tasini*, 533 U.S. 483 (2001) (converting existing newspaper articles to a searchable electronic database).

The correct rule is the one the district court applied: a sound recording that results from modifying (on a computer or not) the existing sounds that the listener will hear is a copyrightable derivative work as long as it results from the requisite "minimal amount" of creativity and originality. Even Appellants' *amici* concede this. *See* RIAA Amicus at 2 ("whether the post-1972 digital remastering of pre-1972 sound recordings added sufficient originality to create federally copyrighted derivative works" is a "fact intensive issue, which will turn on the nature of the remastering process involved in each particular case"); Flo & Eddie Amicus at 18 (acknowledging copyrightability turns on a "detailed factual analysis of the level of originality incorporated into the remastered recordings").[6]

Appellants' authorities do not hold otherwise. Opening Brief at 38-40. The New York Court of Appeals in *Capitol Records, Inc. v. Naxos of Am., Inc.* ("*Naxos III*"), 4 N.Y.3d 540 (2005), never addressed whether the remastered sound

---

[6] *See also Maljack Prods., Inc. v. UAV Corp.*, 964 F. Supp. 1416, 1426-28 (C.D. Cal. 1997) (remastered sound recordings protected as derivative works provided they possess a minimal degree of creativity that differs from the original), *aff'd sub nom. Batjac Prods., Inc. v. GoodTimes Home Video Corp.*, 160 F.3d 1223 (9th Cir. 1998); *Pryor v. Jean*, No. CV 13-2867, 2014 U.S. Dist. LEXIS 143515 (C.D. Cal. Oct. 8, 2014) (distinguishing between remastered and original sound recordings); 1-2 Nimmer on Copyright § 2.10 (2015) ("the editing of a previously recorded work may, in itself, involve sufficient originality to command copyright," including acts of "equalizing" and "changing the highs and lows").

recordings were sufficiently original to be federally copyrighted as derivative works. *Naxos III* concerned ***unauthorized*** remastered recordings. The New York Court of Appeals held only that an infringer cannot avoid a common-law copyright claim by remastering ***bootleg*** sound recordings before distributing them. *Id.* at 564-65. The Court never considered whether, if the owner had authorized the creation of the remastered recordings, as was the case here, the remastered recordings could qualify for federal copyright protection.

The district court opinion in *U.S. v. Taxe*, 380 F. Supp. 1010 (C.D. Cal. 1974), is similarly inapposite. That case holds only that one who re-records a song ***without the owner's permission*** is still an infringer, even if he adds original elements to the re-recording. *Id.* at 1013. Nothing in that case addresses whether those types of additions, if authorized, would qualify the work for federal copyright as a derivative work.

Appellants and *amici* resort to a parade of horribles that simply will not follow from the district court's ruling. For example, they claim that the order "effectively turned Appellants' pre-72 recordings into federally governed, post-72 derivative works." Opening Brief at 11. Not true. Authorized remastering creates a new work. Only the derivative work is governed by federal law. Appellants' pre-1972 recordings continue to exist and remain governed by state law. They claim also that "the term of copyright in an underlying work could be extended

indefinitely." Opening Brief at 15. False. Any new copyright term applies only to any new original expression; the term of any copyright for the underlying works remains the same. Appellants claim that "sound recordings will now be routinely remastered by assignees in order to artificially extend assignees' ability to exploit such works." Flo & Eddie at 6. Of course not. Any assignee would still need permission to create a new derivative work. Appellants claim that the owner of the derivative work could now have "considerable power to interfere with the creation of subsequent derivative works." CSEL Amicus at 12. Not so. Absent the unprecedented grant of the *exclusive* right to remaster a recording, which was not the case here, an owner remains free to license the original recording as it pleases.

### B. Appellants Failed to Offer Admissible Evidence on the Copyrightability of the Remastered Recordings

The district court analyzed the sound recordings at issue and determined that each recording that CBS had played contained non-trivial expressive changes from the version of that recording that Appellants' claim to own, and qualified as a derivative work. ER 8-14. The court reviewed the evidence, including the declarations and depositions of CBS's experts Dr. Durand Begault, an acoustic engineer, and William Inglot, a music engineer and producer, as well as Appellant's own expert, Mr. Paul Geluso, a sound recording professional.

The evidence supports the district court's finding. Dr. Begault examined each sound recording and opined that for *all* of the song titles at issue, "CBS did

- 25 -

not use any version of the sound recordings that [Appellants] claim to own." ER 10.[7] Mr. Inglot testified that he personally remastered many of the sound recordings at issue in this matter and that the process was "guided by a sound engineer's 'personal aesthetic'" and was not a mere "drag-and-drop" process of conversion from the analog to the digital format. ER 9. The district court noted that even Appellants' expert, Mr. Geluso, agreed "that the remastering process requires subjective choices involving matters of taste, which alter perceptible aspects of a sound recording" and "that a sound engineer's choices made during the remastering process are creative and subjective." ER 10.

Based on this undisputed evidence, the district court found that the "differences between the recordings—which were explained by Mr. Inglot and objectively measured by Dr. Begault—are not merely mechanical changes or processes such as a change in format, de-clicking, and noise reduction. Nor are the changes 'trivial,' as evidenced by the [Appellants'] repeated decisions to have experienced sound engineers remaster their works. Instead the changes reflect

---

[7] Appellants raise for the first time on appeal that "Dr. Begault compared the wrong things. He did not compare Appellants' original analog master recordings with the digitally remastered" recordings. Opening Brief at 44, n.7. Aside from the fact that this argument has no basis in the record, the "general rule is that [Courts of Appeal] will not consider issues raised for the first time on appeal." *U.S. v. Carlson*, 900 F.2d 1346, 1349 (9th Cir. 1990). Appellants chose to provide digital masters instead of providing their analog masters, as CBS had requested.

multiple kinds of creative authorship, such as adjustments to equalization, sound editing, and channel assignment." ER at 14.

Appellants did not dispute any of this evidence. That was their burden. Once CBS "pointed out" the deficiencies in Appellants' claims, the burden of proof shifted to them to show "significant probative evidence" that any differences between the original and the remastered recordings were mechanical, trivial, or insufficiently original. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Fazio v. City and County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997). Appellants chose not to. Instead, Appellants asked their expert to compare only the first five seconds of each recording to determine whether the pre-1972 recordings were "embodied" in the remastered versions. Opening Brief at 42-43, n.6. By "embodied," he meant that CBS's versions were based on the same studio performances on which Appellants' versions were based. ER 291.

That, however, is not the issue. The issue is whether the versions CBS used were sufficiently different, as a result of artistic choices. Thus, Mr. Geluso's testimony was irrelevant. ER 12.

Mr. Geluso's report was inadmissible for a second reason. He had based his testimony on "performing waveform and spectral analysis" and "critically listening" to the first five seconds of the recordings—"a technique which is unexplained … but appears to involve listening while also paying attention." ER

12. The court held that "forensically comparing only a five second portion of two sound recordings is clearly inadequate to rule out the possibility that non-trivial differences exist between the works." ER 12. The court also held that Mr. Geluso's findings were "unscientific because he failed to disclose in his report the findings from his initial phase inversion testing, which were adverse to [Appellants'] position" and showed audible differences. ER 12. With respect to "critical listening," the court excluded Mr. Geluso's conclusions as "unscientific, and [] unnecessary to aid a fact finder capable of listening to the sound recordings on his or her own." ER 12. The decision to exclude this testimony was proper and not an abuse of discretion.

By failing to come forward with any admissible evidence, Appellants have no basis for arguing now that the differences in the sound recordings are insufficiently original. Appellants' lawyers simply repeat in their Opening Brief that the recordings are "identical," (Opening Brief at 5) not "chang[ed] at all," (*id*. at 42), or "barely perceptible" (*id*. at 15). Such unsubstantiated assertions of counsel are not evidence, nor are they sufficient to create a triable issue of fact, or make the district court's decision appealable. *See Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1033 (9th Cir. 2008).

## C.  Appellants Authorized the Remastered Recordings

CBS agrees with Appellants that any derivative work must be authorized by the owner of the original.  But Appellants concede that they authorized the remastered recordings.  Opening Brief at 4 ("With the advent of digital recordings, Appellants created a digital transfer copy for each of the pre-1972 recordings.").  In many instances, Appellants own the derivative works.  *See, e.g.*, ER 2544-50 (CD liner claiming a 1998 sound recording copyright on behalf of Brunswick).

In identical declarations, Appellants acknowledged that they "entered into license agreements with record companies … to reproduce and distribute" their recordings.  ER 1150-54 (ABS); ER 1168-72 (Barnaby); ER 1141-45 (Brunswick); ER 1159-63 (Malaco).  This is why the court found that "it is undisputed that the remastered recordings that CBS actually performed were created pursuant to an authorization from either [Appellants] or their predecessors in interest."  ER 13-14.

Lest there be any doubt, each Appellant confirmed at deposition that it had authorized the creation and release of these remastered recordings:

Lawrence Kartiganer (Barnaby):

> Q.    Are you aware of any reissued, remastered or re-release version of a pre-1972 recording that Barnaby has not authorized?
> A.    No, I'm not.  ER 166:9-12.

> Q.    Okay and Barnaby has not objected to those reissued recordings; correct?
> A.    Absolutely not.

Q.　Okay and Barnaby, in fact, has been receiving money?

A.　That's right.  ER 167:16-21.

Don Wilson (ABS):

Q.　ABS understood that the recordings would be re-mastered, though, right?

A.　Some of them we – we understood as the technology increased, as things went from LP and cassette to CD.  And we understood they had to be done in such a way that they could be CD's made out of them.  They had to go to digital.  We knew they were going to have to be converted analog to digital.

Q.　And did anything in those licenses prohibit the re-mastering of the recordings?

A.　It didn't specifically say no re-mastering.  But by changing from analog to digital, they would have to be by their nature just re-mastered to that thing.  ER 149:23-150:14.

Q.　So ABS has not objected to any of the re-mastering decisions that have been done for sound recordings that ABS owns; is that correct?

A.　That's correct.  ER 143:14-17.

Paul Tarnopol (Brunswick):

Q.　You knew that in order to release recordings in a digital format that they would in fact be remastered; correct?

A.　Right.  ER 197:18-21.

Thomas Couch (Malaco):

Q.　If Malaco was licensing out its sound recordings to another company that would provide a compilation, it would be expected that they would remaster the sound recording?

A.　Correct.  ER 221:7-11.

Appellants authorized the sound recordings to be equalized (ER 152:25-

153:16, 154:11-17; 170:3-5; ER 198:15-17, 202:2-4; 220:1-4, 221:2-11, 227:24-

228:3), to be optimized for the digital format (ER 149:23-150:14; 167:2-18, 168:11-19, 169:25-170:2; 176:6-13; 197:2-198:6; 221:12-25), to be rebalanced or compressed (ER 154:18-21; 199:24-200:2; 228:21-229:3), and to have their loudness properties adjusted (ER 155:2-10; 200:5-8). Appellants were able to review these remastered recordings and had the authority to accept or reject these versions before their release. ER 142:22-143:17; 216:8-13. Appellants approved each remastered version that was released to the public. ER 150:18-151:2; 166:9-12; 200:14-18, 203:11-13; 215:21-216:2, 216:8-13, 218:14-18, 234:16-20, 236:20-24. At no point has any Appellant suggested that any of those recordings was not authorized (ER 150:18-151:2; 166:13-20, 167:16-18; 201:19-22; 216:8-13), and Appellants continue to collect royalties from them (ER 141:8-10; 167:19-21; 196:18-20; 238:21-24).

In other words, Appellants do not dispute that they authorized the act of remastering. What they dispute is whether they authorized the creation of a new federally copyrighted derivative work. The district court correctly recognized this as legal sophistry. Appellants' argument is "fatally defective because it misconstrues the interaction between copyright and contract law." ER 16. Once Appellants authorized the remastering, copyright law determines whether that remastering results in the creation of a derivative work. The relevant question is

whether the **act** of remastering was authorized; if so, whether that remastering results in a derivative work is a matter of applying copyright law.

*Schrock*, 586 F.3d at 513, is instructive. The defendant hired the plaintiff to photograph its toys for promotional materials. *Id*. at 515. He registered them as derivative works and sued for copyright infringement. *Id*. The district court dismissed the copyright claim because the plaintiff had the authority only to take the photos, not to copyright them. The Circuit Court reversed and explained that, although "the author of a derivative work must have permission to make the work from the owner of the copyright in the underlying work … there is nothing in the Copyright Act requiring the author of a derivative work to obtain permission to copyright his work from the owner of the copyright in the underlying work." *Id.* at 523. All that matters is whether there is authority to **create** the work. If so, "the Act provides that copyright in a derivative work, like copyright in any other work, arises by operation of law." *Id.* Professor Nimmer agrees that "the right to claim copyright in a noninfringing work arises by operation of law, not through authority from the copyright owner of the underlying work." 1 *Nimmer on Copyright* § 3.06. *See also Mahavisno v. Compendia Bioscience, Inc.*, No. 13-12207, 2015 WL 248798, at *9 (E.D. Mich. Jan 20, 2015) (denying motion to dismiss infringement claim because if plaintiff was authorized to create new work based on defendants'

original work, "his [derivative] copyright in that work would vest automatically by operation of law, barring any other written agreement to the contrary").

Here, the district court correctly held that, because Appellants had authorized the act of remastering, it was their burden to prove that they had "affirmatively barred the creation of a copyrightable work." ER 17.[8] Appellants contend that it was "CBS's burden [] to demonstrate that Appellants had granted the right to create a derivative work." Opening Brief at 34. That is not the law. Appellants cite *Fahmy v. Jay-Z*, No. 2:07-cv-05715, 2015 WL 3407908 at *5 (C.D. Cal. May 27, 2015) for the proposition that "CBS, as the alleged infringer, has the burden of showing that it holds a license." Opening Brief at 33. But Appellants' brief omits the opinion's crucial next sentence: "***However, where the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized.***" *Fahmy*, 2015 WL 3407908 at *5 (emphasis added). CBS was not even the entity that created the remastered recordings. Here, there is no dispute that the parties who created the remastered

---

[8] Appellants argue that the district court erred because the case it cited, *L.A. Printex Indus., Inc. v. Aeropostale*, No. CV 08-7085, 2010 WL 2813800 at *3 (C.D. Cal. May 5, 2010), was overturned on appeal. The case, however, was overturned on other grounds. In any event, the district court's ruling is equally supported by other cases, including the one Appellants rely on. *See Fahmy v. Jay-Z*, 2015 WL 3407908, at *5 (C.D. Cal. May 27, 2015).

recordings did so under licenses from Appellants.  The only question is whether

those licenses specifically barred the creation of derivative works.

Appellants have the burden to prove that such specific prohibitions exist;

they did not and cannot.  Appellants introduced none of the licenses.  Instead, they

filed four identical declarations, each repeating that the Appellant did not grant

permission to create a derivative work.  But when deposed, each declarant

admitted that he did not have personal knowledge of all of the licenses and thus

had no foundation for such a statement.  ER 144:21-146:22 (ABS); ER 162:2-

163:13 (Barnaby); ER 204:12-24 (Brunswick); ER 218:22-219:9 (Malaco).  Given

that testimony, the district court correctly struck the declarations because each

declarant "admit[s] a lack of personal knowledge as to these statements."  ER 16.[9]

If anything, the witnesses confirmed that the opposite was true—that they had

never barred the creation of derivative works.  For example, when Barnaby's

representative was asked "As far as you are aware, do any of the licenses you ever

---

[9] Appellants suggest, for the first time on appeal, that their representatives' declarations constituted summaries of their licenses pursuant to Federal Rule of Evidence 1006.  This ignores the deposition testimony of the declarants admitting their lack of knowledge of the licenses.  It is impossible for a declarant to "summarize" the content of licenses for which he has no knowledge.  Even if Appellants intended these declarations to be summaries, "the admission of summaries under Rule 1006 is within the sound discretion of the trial court." *Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir. 1986).  As Appellants note, they produced the licenses to CBS in discovery (Opening Brief at 36), and the agreements do not bar the creation of derivative works.  If they had, Appellants would have introduced them.

negotiated for Barnaby have a provision that expressly prohibits the creation of a derivative work, that even talks about the subject?" he answered "To my recollection, no."  ER 176:25-177:6.  The other witnesses testified to the same effect.  ER 204:16-24 (ABS's declarant certain that licenses were "silent" on whether sound recordings could be equalized).[10]

## II.  THE DISTRICT COURT CORRECTLY HELD THAT FEDERAL LAW GOVERNS FEDERALLY COPYRIGHTED WORKS

### A.  Federal Law Governs Post-February 15, 1972 Sound Recordings

To the extent there is any copyright protection for sound recordings fixed before February 15, 1972, it arises under a "patchwork of state protection."  ER 1214.  Some states follow the common law, while some states, such as California, enacted statutes to codify that protection.  *See* Cal. Civ. Code § 980.  When Congress extended federal copyright protection to sound recordings in 1971, it did so for only those fixed on or after February 15, 1972.  *See* Sound Recording Act of 1971, Pub. L. No. 92-140, 85 Stat. 391 (1971).

In doing so, Congress rejected any form of public performance right.  In 1976, in response to pressure from record companies like Appellants, Congress

---

[10] Equally odd, Appellants claim that "CBS further had the burden to prove that it was an authorized sublicensee of any of the licenses entered into by Appellants." Opening Brief at 34.  That proof is not required.  As explained next, CBS's right to publicly perform these post-1972 recordings arises from the terrestrial exclusion and compulsory license under federal copyright law—not from a sublicense.

directed the Copyright Office to study the issue of a public performance right in sound recordings and its effects on society. It took the Copyright Office two years, five public hearings, hundreds of comment letters, and over 1,000 pages to respond. *See* Staff of H. Comm on the Judiciary, 95th Cong., *Performance Rights in Sound Recordings* 824 (Comm. Print. 1978). To determine the economic impact of a public performance right on terrestrial broadcasters, the Copyright Office read "26,838 records concerning the financial reports" from over 5,500 AM and FM licensed stations, as well as advertising rates and expenditures. *Id.* at 86. To determine the economic impact of a public performance right on artists, the Copyright Office analyzed a national survey of employment and earnings of performers. *Id.* at 62. Even with this comprehensive analysis, it took Congress until 1995 (with many proposed bills in the interim) to create a limited performance right, but only for digital transmissions. 17 U.S.C. §§ 106, 114-115.

Congress recognized that broad copyright protection for sound recordings, particularly with respect to a public performance right, would have a disruptive impact on the music industry. Congress struggled for years, debating whether to create such a right, as "concern was expressed that granting a performance right in sound recordings would make it economically infeasible for some transmitters to continue certain uses of sound recordings." H.R. Rep. 104-274 at 14; S. Rep. 104-128 at 16. Congress realized that any public performance right would need to

balance the competing interests of sound recording owners, the original performers, composers, broadcasters, and the listening public.

When it finally recognized a public performance right, Congress drew it narrowly. In 1996, it passed the Digital Performance Right in Sound Recordings Act, and in doing so created a ***limited*** public performance right for digital broadcasts, with the intention of "grant[ing] a limited right to copyright owners of sound recordings which are publicly performed by means of a digital transmission." H.R. Rep. 104-274 at 10. Congress's concern with not disrupting the music industry resulted in "various limitations on the exclusive right," *id*., such as: (1) limiting the right to digital audio transmissions (so terrestrial broadcasters could continue to broadcast music without payment); (2) making certain non-interactive digital broadcasts eligible for compulsory license; (3) creating SoundExchange to collect and distribute royalties pursuant to the compulsory license so broadcasters could play music without having to do any research into ownership; and (4) requiring that at least 50% of the royalties collected from digital broadcasters be paid to the performing artists—45% to featured artists, 5% to backup musicians and session players—regardless of which entity owns the sound recording. *Id*.; 17 U.S.C. §§ 114, 115. These limitations were designed to balance the competing interests of the music industry, especially terrestrial broadcasters, particularly since the industry had evolved with no expectation of

such a right. *See* 141 Cong. Rec. S945-02 (daily ed. Jan. 13, 1995) (statement of Sen. Hatch), 1995 WL 15600 at *S948 ("it is … true that long-established business practices within the music and broadcasting industries represent a highly complex system of interlocking relationships which … should not be lightly upset.").

There is no dispute that the remastered recordings at issue here were created after February 15, 1972. ER 1057 at 4; ER 1932-45; ER 2425-31 (summarizing CD liner notes for many of the recordings at issue). Thus, they are subject to the federal limitations Congress created for publicly performing such recordings. As the district court held, "under federal law, CBS has the right to perform post-1972 sound recordings on terrestrial radio without payment, and to perform them through digital platforms under a statutory compulsory license." ER 17.

### B. State Law Cannot Be Used to Control the Use of Federally Copyrighted Works, Even if They Are Derived From or Incorporate Elements of Pre-1972 Sound Recordings

Appellants and their *amici* argue that state law prevents the application of federal law to the remastered recordings, even though they were fixed after 1972, because the remastered recordings were "derived" from and thus necessarily contain pre-1972 artist performances. Although courts have never directly addressed what law governs remastered sound recordings, courts ***have*** addressed the interplay between state and federal law in analogous situations where otherwise state-law protected elements are incorporated in federally copyrighted derivative

works.  The rule is clear: if the owner of a work protected under state law authorizes its inclusion into a federally copyrighted work, federal law governs.

In *James v. Delilah Films, Inc.*, 544 N.Y.S.2d 447 (Sup. Ct. 1989), the plaintiffs were members of 1960s "girl groups" who sued the makers of a movie that contained footage of the groups performing their songs.  The copyrighted footage included pre-1972 sound recordings that the plaintiffs had sung.  Even though the owners of the footage had granted the moviemakers permission to use it, plaintiffs sued under state law, claiming that 17 U.S.C. § 301(c) preserves their state law claims for the use of the pre-1972 recordings.  The court rejected the claim.  It held that, because plaintiffs had authorized the inclusion of their recordings in the copyrighted footage, federal law governed the use of that footage and plaintiffs could not separate the pre-1972 recordings that were incorporated into it to invoke state law to prevent the use of their recordings.  *Id.* at 450.  The court held that "[t]hough the court sympathizes with plaintiffs, who may or may not have been justly compensated for their original work, the court is constrained to follow the Federal [rather than state] law," and thus held that the plaintiffs' claims were preempted.  *Id.* at 449.  That principle disposes of this case.

Courts have followed a similar rule for owners of state law copyrights in unpublished works: once owners authorize their inclusion in federally copyrighted works, they cannot invoke state law to control that work.  In *Shoptalk, Ltd. v.*

- 39 -

*Concorde-New Horizons Corp.*, 168 F.3d 586 (2d Cir. 1999), the Second Circuit analyzed the interaction between the federally copyrighted 1960 movie *The Little Shop of Horrors* and the state-law protected unpublished 1959 screenplay on which it was based. The movie's copyright had not been renewed and therefore expired in 1988, after which it entered the public domain. The Second Circuit refused to allow the author to retain state-law rights for the parts of his screenplay that he had authorized to be included in the movie, because "a single work cannot be protected from copying under both federal and state law at the same time." *Id.* at 590.

The same is true for state-law protection of ideas. Some states provide protection for ideas. *See, e.g., Nadel v. Play-by-Play Toys & Novelties, Inc.*, 208 F.3d 368 (2d Cir. 2000) (misappropriation of ideas claim under New York law). Once a state-protected idea is authorized to be incorporated into federally copyrighted work, however, state law cannot be used to restrict the exploitation of that work. In *Spear Mktg., Inc. v. BancorpSouth Bank*, for example, the Fifth Circuit recognized that state law rights in ideas must be preempted even though federal copyright law does not protect ideas. Otherwise, "the result would be that state law could be used to protect … even those ideas embodied in a published literary work." 791 F.3d 586, 596 (5th Cir. 2015); *see also Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (en banc) (allowing state law

rights to support idea misappropriation claim but noting that if the idea had been "written down or otherwise recorded," federal copyright law would control).

The same rule applies for right of publicity claims under state law. In *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006), Laws recorded the song *Very Special*, to which Elektra obtained the copyright. Years later, Sony obtained a license from Elektra to include a small sample of Laws' recording in a new song. After that became a hit, Laws brought state-law right-of-publicity claims alleging that Sony's use of *Very Special* misappropriated her name and voice. This Circuit held that "it is clear that federal copyright law preempts a claim alleging misappropriation of one's voice when the entirety of the allegedly misappropriated vocal performance is contained within a copyrighted medium." *Id.* at 1141. Because Sony obtained authorization to incorporate Laws' song into the derivative work, federal law controlled. And because Laws' "state tort action challenge[d] control of the [copyrighted] work itself," *id*. at 1142, her claims were preempted. This Court affirmed the summary judgment in Sony's favor.

This Court recently reaffirmed this principle in *Maloney v. T3Media, Inc.,* No.15-55630, 2017 WL 1244899, at *5 (9th Cir. Apr 5, 2017). There, former college athletes sued for violation of their state-law right of publicity when defendants sold licenses allowing consumers to download photographs of them from defendants' archives. There was no dispute that the photographs were

lawfully taken. This Court stated that "when a likeness has been captured in a copyrighted artistic visual work and the work itself is being distributed for personal use, a publicity-right claim interferes with the exclusive rights of this copyright holder, and is preempted by section 301 of the Copyright Act." *Id*. In doing so, this Court affirmed the principle that plaintiffs cannot use state law to challenge "control of the artistic work itself," or to "interfer[e] with the distribution, display, or performance of a copyrighted work." *Id*. at *13, *7.

California state courts have also followed this principle. In *Fleet v. CBS, Inc.*, 50 Cal. App. 4th 1911 (1996), an actor in a movie, Stephan Fleet, asserted his right of publicity to thwart the copyright owner from exploiting its property by distributing the movie. Fleet argued that because his name, voice, likeness, and persona were not copyrightable under federal law, a state infringement action based on the right of publicity posed no threat to the federal copyright scheme. *Id.* at 1919. The California Court of Appeal disagreed, pointing out that although Fleet's persona was not copyrightable, once his performance was put on film it became a dramatic work fixed in a tangible medium of expression that fell under the scope of federal copyright law. *Id.* at 1919-20. The court stated that Fleet sought to "prevent a party from exhibiting a copyrighted work." *Id.* at 1920. But

because federal copyright law protected the lawfully-created film, Fleet could not use his state law rights in his persona to prevent its distribution.[11]

### C. Appellants' Invocation of State Law Frustrates Federal Law and Defeats the Limitations and Exclusions Congress Enacted for Sound Recording Copyright Protection

Appellants and their *amici* do not hide their goal of using state law to circumvent the carefully designed exclusions and limitations Congress placed on copyright protection for sound recordings. Instead of allowing terrestrial broadcasters to freely broadcast music, and digital broadcasters as long as they report and pay royalties to SoundExchange, Appellants and *amici* want to require broadcasters to identify the owners of each underlying pre-1972 sound recording, research that owner's rights, and individually negotiate a license with each such owner before the broadcaster can play that song. Opening Brief at 31.

This applies equally, as *amici* note, to remixed or sampled recordings. CSEL Amicus at 21. To avoid liability, broadcasters would have to know that Beyonce's popular song *Crazy in Love* sampled the song *Are You My Woman (Tell Me So)* by the Chi-Lites, which Brunswick released in 1970; that Kanye West's

---

[11] Of course, the rule would be different if the use of the persona in the copyrighted work were not authorized. In *KNB Enterprises v. Matthews*, 78 Cal. App. 4th 362 (2000), the court held that a right of publicity claim based on the use of two models' images in an advertising campaign was not preempted. The court distinguished the case from *Fleet* because the defendant "had no legal right to publish the copyrighted work." *Id.* at 374.

double-platinum song *Otis* samples Otis Redding's 1966 *Try A Little Tenderness*; or that Gotye's eight-time platinum song *Somebody That I Used To Know* samples Luiz Bonfa's 1967 song *Seville*. Appellants want to require every broadcaster to undertake a costly investigation of every copyrighted recording to ensure that it contains no portion of any pre-1972 recording before they could play it.

For example, if CBS wanted to broadcast *Crazy in Love*, it would need to figure out that it included some of *Are You My Woman (Tell Me So)*, determine that Brunswick currently claims to own the state-law rights to the pre-1972 recording, and then negotiate a separate license with Brunswick. And CBS would have to take those steps in each state in which it wanted to play the record.[12]

Appellants' approach would defeat the safe harbor Congress created in enacting Section 114. Congress provided that broadcasters would be able to pay a statutory fee to play sound recordings. *See* 17 U.S.C. § 114(f)(4)(B) ("any person who wishes to perform a sound recording publicly by means of a transmission eligible for statutory licensing … may do so without infringing the exclusive right of the copyright owner of the sound recording."). And *amicus* RIAA concedes that Congress did not anticipate a "fact-intensive question that broadcasters would need

---

[12] Under Appellants' position, record companies could simply exempt any recording they wanted from the Section 114 compulsory license by including a small sample from a pre-1972 recording, and thereby force broadcasters to individually negotiate for every such recording. State law rights in the underlying work cannot be used to so easily defeat federal law.

to investigate recording by recording before determining whether they could use a particular recording under a compulsory license." RIAA Amicus at 17. As the RIAA suggests, broadcasters cannot and are unlikely to undertake such a "fact-intensive" "case-by-case inquiry." *Id*.

Appellants' position is similar to one taken by the owners of pre-1972 sound recordings in *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78 (2d Cir. 2016). The question was whether the 1998 Digital Millennium Copyright Act's "safe harbor" provisions (17 U.S.C. § 512) are confined to post-1972 sound recordings or whether the safe harbor covers pre-1972 sound recordings, too. As here, the plaintiffs argued that Section 301(c) affords pre-1972 sound recordings some "special status" that exempts them from other provisions of federal copyright law. The Second Circuit rejected that argument, holding that the safe harbor applied to all sound recordings. Conferring special status to pre-1972 sound recordings would "defeat the very purpose Congress sought to achieve in passing the statute" and force service providers "either to incur heavy costs of monitoring every posting to be sure it did not contain infringing pre-1972 recordings, or incurring potentially crushing liabilities under state copyright laws." *Id.* at 90.

The district court here correctly determined that CBS could publicly perform the remastered recordings in accordance with Section 114. ER 17. Appellants' position would also extend to remixed sound recordings or recordings with

samples in them. That would give record companies a veto over federal law. If a record company did not wish to subject a recording to the compulsory license, it could add a five second snippet of a pre-1972 sound recording and invoke state law to control its use. If Appellants are right, this provides plaintiffs with a blueprint for defeating federal law.[13]

### D. Appellants' Arguments for the Application of State Law Fail

#### 1. The Ruling Below Does Not Conflict With Section 301

Judge Anderson's decision is consistent with Section 301(c). It did not apply federal law to pre-1972 sound recordings. It applied federal law to post-1972 sound recordings, and did so correctly. Section 301(c) states that "With respect to sound recordings fixed before February 15, 1972, any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067." Indeed, the only *sound recordings* that CBS broadcast are the remastered sound recordings, which were created long after 1972.

Appellants' position conflicts with Section 301. They argue that federal law should govern the "new parts" of a derivative work but that state law should

---

[13] The Section 114 compulsory license is not the only one that would be frustrated. 17 U.S.C. § 111 codifies the cable retransmission license, which allows cable television providers to retransmit certain works pursuant to a statutory license. If Appellants could use their state law rights to control federally copyrighted works, they could force cable broadcasters, who rely on the cable retransmission compulsory license, to individually negotiate for any television episode that happened to include a pre-1972 sound recording.

continue to govern the "old parts" taken from a pre-1972 sound recording. But nothing in the text of Section 301 supports this Frankenstein approach over which law governs. Section 301 says that federal law applying to entire "works of authorship"—not to "parts" of those works. Similarly, Section 301(c) says that the law that applies to "sound recordings" is based on whether they are fixed before or after February 15, 1972. It does not say that one set of laws applies to only certain "parts" of such a sound recording.

Congress enacted Section 301 to create a single copyright system that creates a clear line between federal and state protection. Congress sought to "foreclose any conceivable misinterpretation of [Section 301's] unqualified intention that Congress shall act preemptively, and to avoid the development of any vague borderline areas between State and Federal protection." H.R. Rep. 94-1476. Congress had good reason to do this, namely to do away with the "anachronistic, uncertain, impractical, and highly complicated dual system" of copyrights. *Id.* Appellants want to frustrate Congress's purpose in creating Section 301. Rather than leaving state law to govern pre-1972 sound recordings, Appellants want to revive the "highly complicated dual system" of copyrights and apply it to a broad swath of post-1972 remastered, remixed, or sampled sound recordings. Nothing in Section 301 supports Appellants' approach. They cannot cite a case where this was the result, even though they claim (without any support)

that "all cases addressing this issue have reached the opposite conclusion."

Opening Brief at 15. In fact, there exists no authority to support it.

This bright line approach of applying federal law to post-1972 sound

recordings is fair. Owners of pre-1972 sound recording still retain all of their

rights in those recordings. And they have the right and the ability to **_not_** allow the

creation of any derivative works, by not authorizing them. As the district court

explained:

> However, the possibility of any such harm is wholly within Plaintiffs'
> control because derivative sound recordings can only be prepared with
> Plaintiffs' authorization, and the terms of the authorizing contract or
> license can validly limit the ability of the licensee to create a
> derivative work.

ER 9, n.7.

### 2. The Ruling Does Not Conflict With Section 103(b)

To justify the application of state law, Appellants and their *amici* also try to

read something into 17 U.S.C. Section 103(b) that is not there. Section 103(b)

states that the "copyright in a compilation or derivative work extends only to the

material contributed by the author of such work, as distinguished from the

preexisting material employed in the work, and does not imply any exclusive right

in the preexisting material." 17 U.S.C. § 103(b).

No one disputes that copyright protection extends only to the original, new

material in a derivative work. Section 103(b) simply describes the **_scope_** of federal

copyright in a derivative work. It does not answer the question of whether state or federal law applies to it. Nothing in Section 103(b) suggests that, because the scope of copyright protection extends only to the original, new material, some other portion of the same work is to be controlled by state law.

Courts have recognized this key difference. Section 102(b)—like Section 103(b)—limits the scope of copyright and states that "[i]n no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery in a work." 17 U.S.C. § 102(b). Even though the scope of the copyright is limited in this way, courts have made clear that federal law governs the entire copyrighted work. Indeed, the Ninth Circuit has noted that, even where an idea may normally be the basis for a state law claim, once that idea has been "written down or otherwise recorded" in a federally protected work, federal copyright law governs that entire work. *Montz*, 649 F.3d at 979. Appellants have cited no authority to the contrary.

### 3. The Ruling Does Not Conflict With *Stewart v. Abend*

As a last stand, Appellants and *amici* cite *Stewart v. Abend*, 495 U.S. 207 (1990). But that case does not address the issue of what law governs a copyrighted derivative work. In *Abend*, the executor of the estate of the author of the short story on which the movie *Rear Window* was based died before he could renew the copyright in his story and extend the term of the license he had granted to produce

and distribute the movie. *Id.* at 212. The Court held that, given the lapse in grant of rights for the derivative work (the movie), the defendant lacked the authority to continue to exhibit it. *Id.* at 221. In other words, because the right to prepare the derivative work had lapsed, the derivative work was no longer an authorized work. The use of such a work is infringing "if one who employs the work does not have a valid license or assignment for use of the pre-existing work." *Id.* at 223. That is not this case. Here, each derivative work—each remastered recording—was and remains authorized by the owner of the recording from which it was prepared, and Appellants have cited no evidence or authority to the contrary.

CBS does not dispute that the creation of the derivative work requires the authorization of the owner of the underlying work. If the remastered recordings were not authorized, Appellants may well have state law claims. *See, e.g., Taxe*, 380 F. Supp. at 1011 (criminal copyright infringement claim based on unauthorized pirated derivative works); *Capitol Records, Inc. v. Naxos of Am., Inc.*, 262 F. Supp. 2d 204, 208-09 (S.D.N.Y. 2003) (defendant could not argue a "fair use" defense for an unauthorized derivative work by claiming it transformed the plaintiff's original work into a "new" work). But here, there is no dispute that Appellants authorized the creation of the remastered recordings.

Based on *Abend*, Appellants contend that ***two*** consents are required for CBS to broadcast remastered pre-1972 sound recordings: one from the derivative work's

- 50 -

owner and one from the underlying work's owner. Opening Brief at 24. Whether two separate consents are required ultimately depends on the facts. In many instances, consent from the underlying work's owner can be inferred. *See Gilliam v. ABC*, 538 F.2d 14, 20 (2d Cir. 1976). Here, no further consent is necessary. As explained above, CBS's right to broadcast music comes from the operation of federal law. CBS does not need any additional consent once Appellants authorized the creation and commercial release of the remastered sound recordings.[14]

## III. THE DISTRICT COURT PROPERLY EXCLUDED PLAINTIFFS' INADMISSIBLE EVIDENCE

As to 126 of the 174 recordings at issue here, there is an independent basis to affirm the district court's grant of summary judgment: Appellants failed to provide any admissible evidence that CBS actually broadcast those 126 recordings in California. The district court properly sustained CBS's hearsay objection to the Triton reports that Appellants relied on. ER 18-20.

The Triton reports are not subject to the business records exception. Appellants concede that Fed. R. Evid. 803(6) requires a showing that a business

---

[14] That said, Appellants *did* consent to CBS playing their music, through decades of assent with regards to the broadcast industry. Record companies have traditionally urged terrestrial radio stations to play pre-1972 music to maintain public interest in the music and to drive sales of records. *See Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 487 (3d Cir. 2003) ("The recording industry and broadcasters existed in a sort of symbiotic relationship wherein the recording industry recognized that radio airplay was free advertising that lured consumers to retail stores where they would purchase recordings.").

record "was made at or near the time by—or from information transmitted by—someone with knowledge," that the record was "kept in the course of a regularly conducted activity of a business," that the record was "a regular practice," and that there is no reason to believe "the source of information or the method or circumstances of preparation indicate a lack of trustworthiness."  To establish foundation, Appellants were required to produce a witness that "understand[s] the record-keeping system."  *United States v. Ray*, 920 F.2d 562, 565 (9th Cir. 1990).

Appellants offered no foundation.  They did not present any witness from Triton—or anyone else familiar with Triton's reports—to establish a foundation for, or to testify to the reliability of, the reports.  On appeal, the best Appellants can come up with is testimony from CBS's Seth Neiman.  Opening Brief at 48-49. Appellants contend that Mr. Neiman "understood the record-keeping system of the Triton reports" because he was able to read the reports and relay what they say. But Mr. Neiman's testimony belies this assertion, and instead showed that he lacked sufficient knowledge of the reports to establish the necessary foundation:

> Q.  Why does CBS hire Triton to prepare those reports as opposed to preparing them itself, like it does for the original broadcast stations?
> A.  I don't know. …
> Q.  Is there a name for those reports?
> A.  I don't know. …
> Q.  And where are they kept?
> A.  I don't know.
> Q.  Are they kept on a computer someplace?
> A.  I would assume so. …

Q.    Have you ever seen these reports?
A.    Um. … I don't remember.  I might have.

ER 637-40.  Devoid of any foundation, the evidence was properly excluded.  *See NLRB v. First Termite Control Co.*, 646 F.2d 424, 427 (9th Cir. 1981) (records excluded as hearsay where witness "had no knowledge of how [the relevant] records were made or maintained"); *Tongil Co. v. Vessel Hyundai Innovator*, 968 F.2d 999, 1000 (9th Cir. 1992).

Even if the Triton reports could be considered admissible business records, the district court identified two additional reasons why the evidence did not satisfy Appellants' burden.

First, artists often recorded the same song for multiple companies.  Without additional information, someone reviewing a list of artists and song titles "could not tell" which particular sound recording was being referenced.  ER 85-87. Appellants argue that this problem could have been solved by looking at the album titles in the Triton reports.  But not only did Appellants never establish any foundation for the album title information, they provided no evidence linking album titles to the sound recordings Appellants claim to own.  Thus, "even if the Triton reports were admissible, the information contained in them would be insufficient to carry [Appellants'] burden of demonstrating that CBS performed their pre-1972 Sound Recordings."  ER 19.

<u>Second</u>, the Triton reports do not show which recordings were performed in California—a requisite for any copyright infringement claim based on California law. ER 101. The reports show only that CBS performed a sound recording somewhere in the United States, not that CBS did so in California. Appellants never address this issue.

On this record, the district court was well within its discretion to exclude the Triton reports. *See Falcon Enterprises*, 438 F. App'x at 581. Appellants' backup suggestion that the Triton reports "at the very least" create a triable issue (Opening Brief at 47) is wrong. A party cannot create a triable issue with inadmissible evidence. *Equals Three, LLC v. Jukin Media, Inc.*, 139 F. Supp. 3d, 1094, 1102 (C.D. Cal. Oct. 13, 2015) ("the Court may not consider inadmissible hearsay evidence that could not be presented in an admissible form").

## IV. THE DISTRICT COURT PROPERLY EXERCISED ITS DISCRETION TO STRIKE APPELLANTS' CLASS CLAIMS

Under the Central District's local rules, a party pursuing a class action must file a motion for class certification within 90 days of service of the complaint. Central District Local Rule 23-3. Any request for a continuance must be submitted well in advance of the deadline and supported by "specific, concrete reasons supporting good cause." ER 2940. Before filing the motion, counsel must discuss "thoroughly, preferably in person, the substance of the contemplated motion." Local Rule 7-3; Standing Order § 6(a). The notice of motion must include a

statement that the meet-and-confer conference took place and the hearing must be noticed for no more than 35 days later. ER 2936.

Appellants failed to comply with each of these requirements. They waited until three days before the class certification motion deadline to seek an extension, and sought one without any showing of good cause. They repeated that process on the day before the deadline, again without making the required showing of good cause. They failed to meet and confer, ignored the Court's Standing Order concerning the scheduling of motions, and filed a last-second motion without the required certificate of counsel. Appellants offer no explanation *why* they did not comply with these requirements, but argue that their failures were "trivial." Opening Brief at 51.

This was not, as Appellants suggest, two meaningless oversights in the "notice" of motion. The reason Appellants did not include the required certification that the parties met and conferred in the notice was because Appellants never even requested that the parties meet and confer. Although the parties discussed Appellant's last-minute request to extend their deadline for filing the class certification motion, the "substantive" and "thorough[]" discussion required by Local Rule 23-3 and the district court's Standing Order never occurred. Any suggestion otherwise (Opening Brief at 52) is false.

District court local rules and standing orders have "the force of law," *Hollingsworth v. Perry*, 558 U.S. 183, 191 (2010); *Tucker v. Colo. Dept. of Public Health and Env't*, 104 F. App'x. 704, 707 (10th Cir. 2004); Fed. R. Civ. Proc. 83(b). The need to follow them is no less important in class action cases. Even though, as Appellants argue, one cannot obtain a certified class without making a motion, the meet-and-confer requirements are not "superfluous" rules they can disregard. Opening Brief at 52. The parties are required "to discuss thoroughly the substance of the contemplated motion" to streamline the "substantive issues" in dispute. Standing Order, ER 2936. *See Motty v. First Student, Inc.*, No. 2:15-cv-7463, 2016 WL 4498452 at *4 (C.D. Cal. August 26, 2016) (denying class certification for reasons including failure to meet and confer: "[Counsel's] actions … gives the Court the greatest pause. Counsel has not abided by the Court's meet-and-confer requirements"); *Spann v. J.C. Penny Corp.*, No. SA CV 12-215, 2013 WL 11332969 at *1 (C.D. Cal. July 15, 2013) (requiring meet and confer for class certification motion).

The district court has "a large measure of discretion" in interpreting and applying its rules and orders. *Lance, Inc. v. Dewco Servs., Inc.*, 422 F.2d 778, 784 (9th Cir. 1970); *see also Oliva v. Sullivan*, 958 F.2d 272, 273 (9th Cir. 1992) (district courts "have inherent power to control their dockets and may impose

sanctions, including dismissal, in the exercise of that discretion").[15]  This Court has

affirmed that discretion even when it comes to striking class allegations.  *See*

*Watson v. Schwarzenegger*, 347 F. App'x 282, 285 (9th Cir. 2009) (unpublished)

(finding no abuse of discretion when court struck plaintiffs' class allegations

because "Watson's unfamiliarity with the local rules and unnecessary delay in

filing his motion did not constitute excusable neglect"); *cf. Pincay v. Andrews*, 389

F.3d 853, 859 (9th Cir. 2004) (en banc) ("a lawyer's failure to read an applicable

rule is one of the least compelling excuses that can be offered").

Requiring compliance with the rules is even more important in the class

context.  Before certifying a class under Fed. R. Civ. Proc. 23, a court must

consider the "competency of counsel," *Hanlon v. Chrysler Corp.*, 150 F.3d 1011,

1021 (9th Cir. 1998), which includes an assessment of counsel's performance in

Court, *see Kandel v. Brother Int'l Corp.*, 264 F.R.D. 630, 634-35 (C.D. Cal. 2010)

(denying class certification where proposed counsel's inadequacy was shown by

"numerous errors").  A failure to comply with the local rules—including, for

example, a failure to submit mandatory chamber copies—can support a court

finding that counsel will not adequately represent the class and a denial of class

---

[15] *Munchoff v. Munchoff* does not say otherwise.  That case stands for the
proposition only that courts in their discretion can choose not to enforce a
provision of the local rules.  No. SACV 15-883, 2015 WL 5167625 at *2 (C.D.
Cal. Sep. 3, 2015).  Nothing in *Munchoff* ***requires*** such leniency.

certification.  *See Buckland v. Maxim Healthcare Servs., Inc.*, No. CV 11-8414, 2012 WL 3705263 at *8 (C.D. Cal. Aug. 27, 2012).

Whether through ignorance or willful disregard, the district court had before it plaintiffs and their counsel who had violated the Local Rules and its Standing Order in at least five ways in just three days.  Appellants' attempt to trivialize the violations and to falsely suggest that the parties had met and conferred serves only to confirm the reasonableness of the district court's exercise of its discretion.

This Court did not hold otherwise in *Perez v. Safelite Group Inc.*, No. 12-55657, 2014 U.S. App. LEXIS 4353 (9th Cir. Mar. 7, 2014).  That case did not involve the failure to comply with local rules or court orders.  Rather, that case involved the denial of pre-certification discovery "without reasoning" and the denial of class certification without "address[ing] the need for certification discovery."  *Id.* at *2.  This Court found an abuse of discretion because Perez had met his burden to justify pre-certification discovery and the district court denied Perez that opportunity.  That case does not suggest that a district court must overlook repeated violations or that it must indulge class action with parties and counsel who either ignore or do not care what the Local Rules and its Standing Order require.

## **CONCLUSION**

For the reasons stated above, the district court's orders granting summary

judgment and striking the class allegations should be affirmed.


Dated:  May 8, 2017                           Respectfully submitted,

                                             IRELL & MANELLA LLP


                                             By:_____*/s/ Robert M. Schwartz*_____
                                                   Robert M. Schwartz
                                                   Attorneys for Defendants-Appellees
                                                   CBS Corporation and
                                                   CBS Radio Inc.

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Ninth Circuit Rule 28-2.6, Appellees respectfully state that there

are no other related cases pending in this Court.

Dated: May 8, 2017

IRELL & MANELLA LLP


By: _____*/s/ Robert M. Schwartz*_____
      Robert M. Schwartz
      Attorneys for Defendants-Appellees
      CBS Corporation and
      CBS Radio Inc.

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28-1.1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 16-55917

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28-1.1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is 13,985 words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated _____
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | s/ Robert M. Schwartz | Date 05/08/2017

("s/" plus typed name is acceptable for electronically-filed documents)

*(Rev.12/1/16)*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 8, 2017, I electronically filed the foregoing with the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  May 8, 2017

IRELL & MANELLA LLP

By: _____*/s/ Andrew J. Strabone*_____
       Andrew J. Strabone